**In re Philip Joseph POLLINA, Bankrupt.**

**D. NAGIN MFG. CO., Plaintiff,**

**v.**

**Philip Joseph POLLINA, Defendant.**

**Bankruptcy No. 81–4549.**

**Adv. No. 81–1048.**

**No. Civ. 83–808.**

United States District Court,
D. New Jersey.

May 31, 1983.

Eric J. Bal, Union City, N.J., for plaintiff.

Alfred J. Zazella, Zazella & Singer, Wayne, N.J., for defendant.

## OPINION

BIUNNO, Senior District Judge.

This is an appeal from an order of the Bankruptcy Court dated February 14, 1983 dismissing plaintiff's complaint and discharging the debtor from plaintiff's claim.

Because the Bankruptcy Court misconstrued the law as stated in the Bankruptcy

Code of 1978, 11 U.S.C. § 523(a)(2), as applied to the pertinent facts not in dispute, the order will be reversed and the Bankruptcy Court will be directed to enter an order denying discharge of the plaintiff's claim.

The "debtor", Philip Joseph Pollina, is the "person ... concerning which a case under this title [11 U.S.C. §§ 1, et seq.] has been commenced", see 11 U.S.C. § 101(12).

Pollina was president of S. Pollina Jewelers, Inc., a N.J. corporation that had been owned and operated as a retail jewelry store by Pollina's father for several decades. When the father died, Pollina undertook to operate the corporate business, owning 2 shares of stock. The remaining 98 shares were owned by his mother.

The business obtained its inventory from a number of sources including D. Nagin Manufacturing Co., which had done business with the store for some time. Inventory purchases were on open account.

In the latter part of 1979, the store owed Nagin some $17,000. on items covered by 59 invoices and a discussion was had between Pollina and Nagin about payment. The testimony clearly is that Nagin did not expect payment at once in a single sum but was concerned about receiving payments on account to reduce the net balance so that further orders could be filled.

The witnesses were also agreed that in the period before Christmas, inventories are high, as are inventory accounts payable, but that the cash flow usually improves after Christmas as inventory is sold in the holiday season, typically at prices double the wholesale prices.

Nagin's stenographer prepared a printed form of UCC Security Agreement (Blumberg form 936) after some advice from an attorney about what to put in the blanks. It called for securing the sum of $16,790.92,

payable at the rate of $500 a month by a series of notes with interest at 1.5% per month, the first one being due December 30, 1979. All the notes are dated November 20, 1979, and the security agreement is dated November 21, 1979. The notes and security agreement carry the corporate signature. The security agreement also contains the individual guarantee of Pollina for "full and prompt performance and payment." [1]

The security agreement recites that it covers specified invoices and memorandums, from September 14, 1976 on, as well as "all after acquired property and any and all future shipments of jewelry to the debtor by the secured party."

The schedule applies to all jewelry as itemized on the 59 listed invoices and memorandums, whose amounts do total $16,790.92, declared to be located at the jewelry store in Lyndhurst. One of the printed warranties, par. 1b of the form, is that the collateral "is now free and clear of any and all liens", etc., "except as may be set forth in the schedule".

The schedule, which is typewritten, closes with the statement: "There are no prior liens on this merchandise." [2]

Pollina admitted that the discussions leading to the agreement began in about October, 1979 and concerned Nagin's wanting to be protected so far as the $16,000 plus debt was concerned. He did not discuss the financial condition of the company beyond the fact that there were financial problems, and that he was left with quite a problem when his father passed away. He did not believe Nagin asked him about other liens and loans that the company had outstanding, in answer to the question whether he told Nagin of them.

He was aware he had undertaken a personal obligation by the guarantee because he was running the company. He was

1. Pollina listed D. Nagin Manufacturing Co. as one of his creditors and described the debt as a guarantee. However, he evidently entered the amount as $11,000. There is no explanation of the difference between that amount and the sum of $16,790.92 shown by the security agreement and schedule. The record on appeal does not disclose any more than this, so unless there

is no dispute about the amount, it will need to be resolved by the Bankruptcy Court.

2. The usual financing statement was filed with the Secretary of State thus providing a lien ahead of later filings under the Uniform Commercial Code. The false representations involved prior liens already on file, as noted below.

aware of the interest rate. He was aware of earlier filed financing statements and the approximate balances at the time: $70,-000 to Canaveral Capital, $25,000 to Harry Gimbel, assignee of a bank, and $20,000 to S. & G. Sales Corp.

He signed the form because it was a standard form; it was Nagin's idea to protect himself. He agreed to sign it so that he would be protected. He read it to a point; he got a general idea of what it meant. He understood what it meant when it said the collateral was free and clear of all liens but did not tell Nagin about the amount of debt the store had. He signed it because Nagan said that otherwise "he would pull his merchandise out", and he signed to prevent that.

None of the notes was paid when due, and a number of checks from the store to Nagin "bounced". On July 7, 1980, the business was terminated as the result of a sale at public auction under executions issued by the Bergen County District Court to enforce a judgment.[3]

Turning to the statute involved, it is obvious that these admitted facts establish beyond dispute that the debtor, Pollina incurred a debt (by reason of the guarantee) for obtaining an extension, renewal or refinance of credit (for the benefit of the corporation) by a false representation that the jewelry previously bought from Nagin and in inventory was free and clear. It comes within the bar to discharge specified by 11 U.S.C. § 523(a)(2)(A).[4]

The representation as to the absence of liens was made twice: once in the printed warranty and again in the last typed sentence of the schedule. It was false when it was made. Pollina knew it was false at the time, and made it to induce Nagin not to "pull out his merchandise", Nagin relied on it, to his damage.[5]

The case does not involve a bar under 11 U.S.C. § 523(a)(2)(B), since there is no statement in writing respecting the financial condition of "the debtor" (Pollina). If such a statement had been made, whether oral or written, it could not be relied on for a bar under § 523(a)(2)(A) since that provision explicitly excludes a false representation made by statement of financial condition. Instead, a bar due to the furnishing of a false statement of financial condition is covered by § 523(a)(2)(B), which only applies when such a statement is in writing, among other things.[6]

**3.** Had there been no prior filings, the lien under the financing statement would have had priority and any sale under the judgment would have had to be subject to the lien. Since the representation was false, the secured party was damaged by the fact that his lien was fourth in priority.

**4.** There does not appear to be any basis in law for the view that the debt must be incurred for the extension, renewal or refinance of credit for the benefit of the debtor, rather than for someone else, in order to come within § 523(a)(2). See *In re Carroll,* 16 B.R. 494 (D.C.Minn., 1982) where the debtor co-signed a note to support the extension of additional credit by a loan, not to her but to her roommate. Unlike the present case, *Carroll* involved a materially false statement in writing of the debtor/co-signer's financial condition and so was not dischargeable because the debt came within § 523(a)(2)(B). The case at hand comes within § 523(a)(2)(A). The provision in respect to the extension, renewal or refinance of credit applies to both (A) and (B). See, also, *Re Dresser & Co.* 144 F. 318 (D–N.Y., 1905), *aff'd.,* 145 F. 1021 and 146 F. 383 (CA–2, 1906).

**5.** The ruling under appeal included the proposition that because Nagin did not check the Secretary of State's records for earlier UCC filings, he did not "reasonably" rely on the false representation. That proposition does not seem to be in accord with basic principles of law. A grantee who accepts a warranty deed from a grantor relies on the warranties and their series in the chain of title instead of having a title search conducted. The practice has long been followed and can hardly be said to be unreasonable reliance as a matter of law. If the grantee (or Nagin here) checked the records to search out whether there were prior liens, he would be relying on his own search, not on the representation. So far as the facts are concerned the evidence is that Nagin did in fact rely and that Pollina intended that he should. A check of the records would have meant no agreement and no forbearance. And see *Bloemecke v. Applegate,* 271 F. 595 (CA–3, 1921). See, also, *Flood v. East Orange,* 563 F.Supp. 341 (D–N.J., 1983) discussing bargain and sale deeds.

**6.** The differences evident in this case between parts (A) and (B) of § 523(a)(2) are clearly pointed out by *In re Bedard,* 19 B.R. 565 (Bkrtcy., Pa., 1982).

In drafting § 523, Congress used quite different language than had been used in the former section, 11 U.S.C. § 35. The parallel language in former § 35(a)(2) is:

"for obtaining money or property by false pretenses or false representations".

The present provision adds the obtaining of services, and the obtaining of an extension, renewal or refinance of credit, and excludes statements of the debtor's financial condition.

This change of language is much too clear in meaning to be ignored, and Pollina's debt to Nagin falls squarely within it.

The term "financial statement" is not defined in 11 U.S.C. § 101. In ordinary usage it would certainly include the typical balance sheet (assets and liabilities) and profit and loss statement in a business context. It may well apply to an indication of "net worth". In the case of a wage earner, a statement of weekly wages and existing debts may suffice, see *In re Magnusson,* 14 B.R. 662 (Bkrtcy., N.Y., 1981). An ordinary check, on the other hand, probably does not amount to a "financial statement", see *Obrist v. Christensen,* 337 F.2d 220 (CA–9, 1964); followed by *In re Paulk,* 25 B.R. 913 (Bkrtcy., Ga., 1982).

The documents, as well as the testimony of both parties which is in complete agreement, clearly indicate that Nagin sought only to recover his own merchandise sold to the store previously or thereafter, by virtue of the security agreement. He did not seek a first lien on all assets but only on goods sold and not paid for. Since Pollina ran the store, the individual guarantee would tend to induce him to apply the sale proceeds of Nagin-provided merchandise to its unpaid purchase price.

Since the representation about liens was false, and since all the essential elements are admitted by Pollina's own testimony, the result below was erroneous in its application of the law as read. The guarantee was enforceable also because of compliance with the Statute of Frauds, N.J.S.A. 25:1–5 b.