**In re Albert and Lilia MERCADO, Debtors.**

**JOKAY COMPANY, a California Limited Partnership, Plaintiff,**

v.

**Albert MERCADO; Lilia Mercado, Defendants.**

**Bankruptcy No. SA 90–01096 JR. Adv. No. SA 90–0553 JR.**

United States Bankruptcy Court, C.D. California.

Sept. 3, 1992.

See also 124 B.R. 799.

Dennis Winters, Santa Ana, Cal., for debtors.

Steven G. Harman, Anaheim, Cal., for plaintiff.

## MEMORANDUM OPINION

JOHN E. RYAN, Bankruptcy Judge.

Chapter 11 debtor, Albert Mercado ("Debtor"), moves for a new trial on the grounds that this court misapplied the law in ruling that Jokay Company's ("Plaintiff") claim is nondischargeable. Debtor's argument is two-fold: first, that this court should have applied Bankruptcy Code § 523(a)(2)(B) instead of § 523(a)(2)(A) in deciding the issue of dischargeability, and second, that under Federal Rule of Civil Procedure ("FRCP") 60(b)(1), Debtor was "surprised" over an issue of fact raised for the first time at trial.

After a hearing on May 26, 1992, I took the matter under submission.

## JURISDICTION

The Court has jurisdiction over this case pursuant to 28 U.S.C. § 1334(a) (the district courts shall have original and exclusive jurisdiction of all cases under Title 11), 28 U.S.C. § 157(a) (authorizing the district courts to refer all Title 11 cases and proceedings to the bankruptcy judges for the district) and General Order No. 266, dated October 9, 1984 (referring all Title 11 cases and proceedings to the bankruptcy judges for the Central District of California). This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

## STATEMENT OF FACTS

In February 1988, Plaintiff, a California limited partnership, entered into a written agreement with Albert and Lilia Mercado to purchase their interest in real property (the "Property") for $1,050,000. An apartment complex (the "Project") was being built on the Property. During negotiations, Debtor and his partner, Kent Barry ("Barry"), assured Plaintiff that the Project would be completed by the end of April 1988, approximately two months after the closing of escrow, and that $250,000 (the "Funds") would be sufficient to complete the Project and clear all liens. Barry was the general contractor on the Project. On February 29, 1988, Debtor executed an indemnity agreement [1] in favor of Plaintiff in which Debtor promised to oversee the completion of the Project. On March 2, 1988, Plaintiff placed the Funds into escrow for payment of expenses related to the completion of the Project, and obtained a fifty percent interest in the Property. Debtor was present at the closing of escrow. The balance of the sale price on the Property was to be paid at a later date. Debtor and Plaintiff reviewed the obligations together to determine how much would be required to complete the Project. Based on that review, Plaintiff agreed to advance Debtor the Funds. Debtor testified that he and Plaintiff had agreed that the Funds were to be disbursed as follows: $110,000 was to be used to pay off certain realtor expenses and the second deed of trust on the Property, which was in default; and $140,000 was to be deposited

---

1. The indemnity agreement made the following representation:

   1. [Debtor] shall complete construction of the improvements in accordance with the plans and specifications in a good and workmanlike manner, and shall cause the units to be completed for occupancy, ... and a certificate of occupancy to be issued by the appropriate governmental agency. In connection with completion of the improvement, [Debtor] shall continue to be responsible for pay-

   ment of all taxes, insurance and loan payments (interest, principal and impounds, if any) in connection with the Property. [Debtor] shall further cause to be removed all mechanics' liens affecting the Property now or which may hereafter be placed against the Property in connection with the construction of the improvements, or otherwise, placed against the Property ... so that the Property is lien-free as of the date of close of Escrow....

with Coast Bank (the "Bank") to fund timely completion of the Project and pay off certain mechanics' liens. Approximately $100,000 of the funds deposited at the Bank were specifically allocated for completing the Project, and the remaining $40,000 was supposed to clear all mechanics' liens.

The Bank had previously funded a construction loan for the Project and held the first deed of trust on the Property as security. At the time the representations that the Funds would complete the Project and Debtor would oversee the completion of the Project were made, payments on the Bank's construction loan were at least two months delinquent. However, since the Bank had not yet begun foreclosure proceedings, the delinquency did not show up on the Property's title report. The Bank subsequently applied $20,000 of the $100,000 intended to complete the Project to the interest arrearage. Later, the Bank expended $120,000 above and beyond the funds deposited by Plaintiff to complete the Project.

Shortly after escrow closed, payments under other deeds of trust secured by the Property became delinquent. Plaintiff later discovered that Debtor had not disclosed certain liens on the Property and that those liens were in default. Plaintiff subsequently lost the Property after a nonjudicial foreclosure sale. Little, if any, construction work was performed on the Property subsequent to the closing of escrow.

Debtor filed a Chapter 11 petition on March 5, 1990. Plaintiff filed a complaint to determine the dischargeability of its claim against both Mr. and Mrs. Mercado on August 16, 1990.

At trial, I held that Plaintiff's claim against Mrs. Mercado was dischargeable. I further held that Plaintiff's claim against Debtor was nondischargeable. I found that Debtor had represented to Plaintiff that he would oversee the completion of the Project; that Debtor had no intent to honor his commitment to oversee the Project's completion; that Debtor misrepresented to Plaintiff that $250,000 would complete the Project and clear all liens and that the Project would be completed in two months; that Debtor knew of the $20,000 arrearages on the loan from the Bank at the time Plaintiff made its investment in the Project; that Debtor knew the title report would not disclose the arrearages on the Bank loan; that Debtor knew that if the Bank applied $20,000 of the Funds to cure the interest arrearage, insufficient funds would exist to complete the Project; that Debtor failed to inform Plaintiff that the Funds were insufficient to complete the Project; that Debtor knew that the Project could not be completed within two months of the close of escrow; that Debtor knew Plaintiff would not enter into the agreement unless the Funds were sufficient for timely completion of the Project; and that Plaintiff justifiably relied on the information given by Debtor in determining whether the Funds would be sufficient for timely completion of the Project.

Based on those findings, I concluded that Debtor had a duty to verify the information he gave Plaintiff regarding the amount of money and time required to complete the Project; that Debtor had a duty to oversee the completion of the Project; that Debtor either intended to deceive Plaintiff, or was reckless in making the representations to Plaintiff regarding the amount of money and time required to complete the Project; that the representations made by Debtor regarding the necessary time and money were false at the time Debtor made those representations to Plaintiff; and that Plaintiff had been damaged in the sum of $110,000. I granted judgment that $110,000 of Plaintiff's claim against Debtor was nondischargeable.

On April 6, 1992, Debtor filed a motion for a new trial, for reconsideration, or amendment to judgment.

## DISCUSSION

The first issue is whether § 523(a)(2)(B) should have been applied instead of § 523(a)(2)(A) in determining the

nondischargeability of Plaintiff's claim.[2]

Debtor argues that my ruling of nondischargeability was solely based upon the findings that he should have disclosed the $20,000 in arrearages owing on the Bank's construction loan and that Debtor failed to advise Plaintiff that there were additional funds owed that would have to be paid to complete the project. Debtor asserts that his failure to disclose the $20,000 arrearage relates to his "financial condition", and therefore I should have applied § 523(a)(2)(B) instead of § 523(a)(2)(A).[3] Further, since § 523(a)(2)(A) does not apply, Plaintiff cannot prevail under § 523(a)(2)(B) since no written financial statement was provided by Debtor.

Section 523(a)(2)(A) is correctly applied here. First, Debtor's argument ignores a substantial portion of my prior findings that Debtor's obligation to Plaintiff is nondischargeable.

Debtor represented to Plaintiff that the Project would be completed within two months. Debtor represented that he would be responsible for overseeing the completion of construction "in a good and workmanlike manner." Plaintiff reasonably relied on Debtor and Barry to be the people who would be responsible for overseeing the completion of the Project. Yet, Debtor's subsequent actions reflect that he was not overly concerned about completing the Project. Debtor did testify that he asked the Bank to pay some subcontractors, but realistically, very little was done to complete the Project. I had no written evidence that Debtor was communicating with the Bank, and no written evidence that Debtor was making demands upon Barry to properly perform in connection with completion of the Project. These are services, for purposes of § 523(a)(2)(A), that Debtor had represented he would perform. There was no evidence that demonstrated that Debtor had any concern about what was happening on the Project, or that the representations he had made to Plaintiff were being honored. Debtor was not a spectator regarding completion of the Project. He had made firm commitments at the time Plaintiff advanced the $250,000 to see that the Project was timely and properly completed. Debtor's failure to oversee the completion of the Project has nothing to do with his financial condition. I found that, at the time Debtor obligated himself to oversee the completion of the Project, he had no intent of performing that obligation. This misrepresentation as to Debtor's services is sufficient to render Plaintiff's claim nondischargeable under § 523(A)(2)(A).

Additionally, Debtor represented that with the Funds, the project could be completed, free and clear of liens, by June 1988. Debtor testified as to how the funds were supposed to be used. Debtor knew that the Bank had not been paid loan interest for February and March, yet nowhere in his testimony concerning how the funds were to be used did Debtor disclose a provision to bring the Bank current on the $20,000 arrearage. Based on his knowledge that at least an additional $20,000 would be necessary to bring the Bank current, Debtor knew that it was likely to be impossible to complete the Project for $250,000. Debtor argues that these additional misrepresentations relate to his financial condition for purposes of § 523(a)(2)(B). In support,

**2.** 11 U.S.C. § 523(a)(2) states in pertinent part:
(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—
. . . .
(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by—
(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;
(B) use of a statement in writing—
(i) that is materially false;
(ii) respecting the debtor's or an insider's financial condition;
(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied
. . . . .

**3.** "Subparagraph (A) is mutually exclusive from subparagraph (B)". 124 Cong.Rec. H11095–96 (daily ed. Sept. 28, 1978); S17412 (daily ed. Oct. 6, 1978); remarks of Representative Edwards and Senator DeConcini. *Reprinted in* 4 Norton Bankr.L. & Prac. § 523 at 434–35 (Callaghan).

Debtor relies on *In re Phillips*, 27 B.R. 646 (Bankr.M.D.Pa.1982) and *In re Van Steinburg*, 744 F.2d 1060 (4th Cir.1984).

In *Phillips*, debtors had applied to a bank for a loan. 27 B.R. at 646. To secure the loan, debtor executed a security agreement which did not specify what property was given as collateral.[4] The debtors allegedly orally represented that the equipment was unencumbered. *Id.* In deciding that the issue of dischargeability should be determined under § 523(a)(2)(B), the court concluded that "[s]ince the instant case is a dispute regarding the debtors' encumbrances on their assets, this is a matter which concerns the financial condition of the debtors...." *Id.* at 647.

In *Van Steinburg*, a debtor induced a creditor to loan $5,500 by orally assuring him that the loan would be secured by a first priority security interest in certain property. 744 F.2d at 1060. The court held that the oral representations concerning the encumbrances against the property must be in writing to bar the debtor's discharge. *Id.* at 1061 (citing *Blackwell v. Dabney*, 702 F.2d 490 (4th Cir.1983)). In arriving at its conclusion, the court reasoned that,

> [c]oncededly, a statement that one's assets are not encumbered is not a formal financial statement in the ordinary usage of that phrase. But Congress did not speak in terms of financial statements. Instead it referred to a much broader class of statements—those "respecting the debtor's ... financial condition." A

debtor's assertion that he owns certain property free and clear of other liens is a statement respecting his financial condition. Indeed, whether his assets are encumbered may be the most significant information about his financial condition.

*Id.* at 1060–61.

The court's reliance on congressional intent in *Van Steinburg* is strained. The court in *Van Steinburg* fails to cite the language it relies upon to conclude that Congress intended § 523(a)(2)(B) to apply to a broad class of statements. However, based on Representative Edwards and Senator DeConcini's comments [5] in the House Report, it seems more plausible that Congress intended application of § 523(a)(2)(B) to be limited to "the so-called false financial statement." While a financial statement under § 523(a)(2)(B) may not require the formalities of an audited balance sheet or income statement, nothing in the legislative history indicates that § 523(a)(2)(B) should be expanded beyond statements about a debtor's net worth or overall earning capacity. Thus, the legislative history does not support the holding in *Van Steinburg*.

Further, the rationale of *Phillips* and *Van Steinburg* would bring under the umbrella of § 523(a)(2)(B) any transaction that has any effect on a debtor's financial condition. For example, the writing of a check when the debtor knows that insufficient funds exist to cover the check. However, that means extensive case law addressing the dischargeability of claims for bad

---

**4.** The court in *Phillips* noted that, "'equipment' was the sole term in the security agreement describing the property subject to the security interest." 27 B.R. at 646.

**5.** Concerning § 523(a)(2)(B), Representative Edwards and Senator DeConcini's comments were: Subparagraph (B) pertains to the so-called false financial statement. In order for the debt to be nondischargeable, the creditor must prove that the debt was obtained by the use of a statement in writing (i) that is materially false; (ii) respecting the debtor's or an insider's financial condition; (iii) on which the creditor to whom the debtor is liable for obtaining money, property, services, or credit reasonably relied; (iv) that the debtor caused

to be made or published with intent to deceive. Section 523(a)(2)(B)(iv) is not intended to change from the present law since [any] statement that the debtor causes to be made or published with the intent to deceive automatically includes a statement that the debtor actually makes or publish [sic] with the intent to deceive. Section 523(a)(2)(B) is explained in the House report. Under section 523(a)(2)(B)(i) a discharge is barred only as to that portion of a loan with respect to which a false financial statement is materially false. 124 Cong.Rec. H11095–96 (daily ed. Sept. 28, 1978); S17412 (daily ed. Oct. 6, 1978). *Reprinted in* 4 Norton Bankr.L. & Prac. § 523 at 434–35 (Callaghan).

checks under § 523(a)(2)(A) is incorrect.[6]

Lastly, *Phillips* and *Van Steinburg* are distinguishable on the facts from this situation. In those proceedings, each debtor was attempting to obtain loans and the overall financial condition of each was extremely relevant to the lender in granting the loan. In that circumstance, a misrepresentation regarding a material asset that would effect the evaluation of the overall financial condition of the debtor certainly fits within the parameters of § 523(a)(2)(B).[7] However, that is not the situation here. Plaintiff was interested in the financial condition of the Property. Plaintiff was not relying upon the overall financial condition of Debtor. Plaintiff was willing to purchase the Property provided construction could be completed within a certain time period, at a specified cost and title could be transferred free and clear of all liens. The overall financial condition of Debtor was irrelevant to the transaction. Yes, the status of the Property did affect the overall financial condition of Debtor, but this was neither the focus nor the purpose of the inquiry. Plaintiff was not relying on Debtor's financial capacity for completion of the Project. Rather, Plaintiff was relying on the financial condition of the Property, Debtor's promise to complete the Project within two months and Debtor's representation as to the funds necessary for completion. Therefore, I decline to follow the rationale of *Phillips* and *Van Steinburg.*

In contrast to *Phillips* and *Van Steinburg*, another line of cases interprets "financial condition" in § 523(a)(2)(B) more narrowly.

In *In re Pollina*, 31 B.R. 975 (D.C.N.J. 1983), the district court reversed the discharge of a claim against a debtor on the grounds that the bankruptcy court misconstrued § 523(a)(2). *Id.* at 976. *Pollina* involved representations in a written security agreement that certain inventory of the debtor's corporation given as collateral was free and clear of liens. *Id.* The debtor had personally guaranteed the debt secured by the inventory. *Id.* In fact, the collateral had been previously encumbered. *Id.* at 977. The court concluded that the misrepresentation as to the status of the collateral in the security agreement was nondischargeable under § 523(a)(2)(A). *Id.* In reasoning that § 523(a)(2)(B) did not apply, the court considered the meaning of "financial statement":

> The term "financial statement" is not defined in 11 U.S.C. § 101. In ordinary usage it would certainly include the typical balance sheet (assets and liabilities) and profit and loss statement in a business context. It may well apply to an indication of "net worth". In the case of a wage earner, a statement of weekly wages and existing debts may suffice. An ordinary check, on the other hand, probably does not amount to a "financial statement".

*Id.* at 978 (citations omitted).

The court noted that the creditor did not otherwise discuss the financial condition of the company, nor did the creditor otherwise ask the debtor about "other liens and loans that the company had outstanding." *Id.* at 976. The court in *Pollina* then reasoned that, since the creditor "did not seek a first lien on all assets" of the debtor's company, the representations concerning the inventory were not statements concerning the debtor's financial condition, and

6. *See, e.g., In re Kurdoghlian,* 30 B.R. 500 (9th Cir. BAP 1983) (reversing the bankruptcy court's ruling denying the plaintiff's complaint for nondischargeability of a claim under § 523(a)(2)(A) for debtor's bad checks); *In re Rechichi,* 105 B.R. 726 (Bankr.S.D.Fla.1989) (plaintiff's claims arising from bad checks held nondischargeable under § 523(a)(2)(A)); *In re Boyer,* 62 B.R. 648 (Bankr.D.Mont.1986) (dischargeability of bad checks analyzed under § 523(a)(2)(A)).

7. *See, Scott v. Smith,* 232 F.2d 188 (9th Cir.1956) (under the Bankruptcy Act, a debtor's representation as to his ownership of an asset was a statement respecting his financial condition, but a representation that a promissory note was secured by that same asset does not amount to a statement respecting the financial condition of the bankrupt); *see also, Tenn v. First Hawaiian Bank,* 549 F.2d 1356 (9th Cir.1977) (under the Bankruptcy Act, the recording of a deed falsely showing debtors to hold an interest in property when at all times the property was solely owned by their mother was a statement respecting debtors' financial condition).

§ 523(a)(2)(A) was the proper provision to apply. *Id.* at 978.

Similarly, *Matter of Seaborne,* 106 B.R. 711 (Bankr.M.D.Fla.1989), also found that statements regarding a debtor's finances may not be statements concerning the debtor's financial condition. *Id.* at 714. In *Seaborne,* the debtor was the general partner of a limited partnership. *Id.* at 712. The partnership sought a loan from a bank in order to finance the purchase of an office building. *Id.* The bank required the partnership to submit:

> 1) "estoppel certificates to be signed by each of the present tenants of the [office building] ... evidencing a 95% occupancy rate and a gross annual income of not less than $438,900.00", and 2) deliver "partnership participation certificates executed by not less than 50% of the total tenants, which certificates must obligate not less than 50% of the total tenants to become limited partners of the borrower...."

*Id.*

After Debtor delivered estoppel certificates and partnership participation agreements, the bank loaned the partnership $3,150,000. *Id.* at 713. In fact, the debtor knew that some of the alleged limited partners had no intention of making payments pursuant to the terms of their leases, and that only two people from the list of alleged limited partners actually became limited partners. *Id.* The limited partners that did testify admitted that even though they had signed the documents, they never intended to pay any money to the limited partnership nor become limited partners. *Id.* The partnership defaulted on its loan obligation. When the bank subsequently sought to have its claim against the general partner determined nondischargeable under § 523(a)(2)(A), the debtor argued that the bank's only cause of action properly lay under § 523(a)(2)(B). The court rejected the debtor's argument, relying on language from the Congressional Record Statements to conclude that § 523(a)(2)(B) is limited:

> [s]ection 523(a)(2)(B) is meant to pertain to a specific type of financial statement, one that specifically states a debt-

or's or insider's net worth. In addition, the financial statement need not be a formal financial document such as commercial or banking institutions require, but a type of financial statement describing the financial condition of the debtor.

> While it is true the closing documents were being used to denote the [limited partnership's] financial condition in the broadest sense, they are not literal nor actual financial statements denoting the Debtor's financial condition, as Congress intends.

*Id.* at 714 (citations omitted).

I agree with the reasoning set forth in *Pollina* and *Seaborne* concerning the scope of § 523(a)(2)(B). The ordinary usage of "statement" in connection with "financial condition" denotes either a representation of a person's overall "net worth" or a person's overall ability to generate income.

Debtor's statements regarding the Property's total encumbrances and the status of construction did not concern his financial condition. Rather, the statements concerned the financial condition and physical status of the Property. Plaintiff did not insist on a guaranty from Debtor nor did it ask for personal financial statements, because neither were relevant to the transaction. Plaintiff was not interested in the Debtor's financial condition when it purchased Debtor's interest in the Property. Plaintiff only wanted to know how much it would cost to complete the Project within two months, and how much would clear the liens against the Property. Since these statements do not concern Debtor's overall net worth or earning capacity, they are not statements of financial condition. Therefore, § 523(a)(2)(A) was properly applied.

Next, Debtor argues that the issue of whether Debtor knew that the Bank would use $20,000 of the Funds to pay interest to itself, and the court's subsequent holding that Debtor had reason to know of this, constituted a "surprise" to Debtor. Rule 9024 of the Federal Rules of Bankruptcy Procedure incorporates Federal Rule of Civil Procedure 60, which states in pertinent part: "the court may relieve a

party or a party's representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect...." An attorney's ignorance and carelessness does not provide grounds for Rule 60(b) relief. *Bershad v. McDonough,* 469 F.2d 1333, 1337 (7th Cir.1972).

Debtor asserts that Plaintiff did not indicate an intent to use the issue of $20,000 as a basis for nondischargeability, and further argues that he was surprised that the court would consider this issue in its findings.[8]

Debtor's argument misses the point. That Debtor knew or should have known that the Bank would apply the Funds to the interest arrearage is not the significant issue. Rather, Debtor's knowledge of the arrearage and his failure to disclose that fact is the basis for the nondischargeability judgment. Further, the Joint Pre–Trial Order explicitly stated that the issue of whether the Debtor concealed any material facts from Plaintiff was going to be litigated.[9] Further, the facts stipulated to between the parties included that the Bank "applied $20,000 ... from the funds deposited by [Plaintiff] ... to pay interest to itself on the construction loan obtained by [Debtor] and BARRY." Joint Pre–Trial Order at 4. Consequently, Debtor's attorney had adequate notice to investigate and prepare an argument for his client as to whether Debtor knew and failed to disclose to Plaintiff all arrearages on the Property, including the $20,000 owed to the Bank. Any further arguments of fact should have been made during oral arguments last September. He cannot now claim surprise that the court considered this fact in making the findings. Debtor's motion for a new trial under Rule 60(b)(1) and Bankruptcy Rule 9024 is denied.

In summary, the court correctly applied § 523(a)(2)(A) in excepting the dischargeability of the debts to Plaintiff. Further, Debtor was not surprised within the meaning of Rule 60(b)(1) when the issue of the $20,000 arrearages on the Property was presented by Plaintiff in closing argument and made a finding upon which the judgment is based.

The motion for a new trial is denied.

Separate findings of fact and conclusions of law with respect to this ruling are unnecessary. This memorandum opinion shall constitute my findings of fact and conclusions of law.

---

**8.** In his reply to Plaintiff's opposition to motion for a new trial, Debtor argues:

The Court during oral arguments indicated that [Debtor] should have known that Coast Bank would have withdrawn those funds. Had [Debtor] known that the Court would consider such an argument, [Debtor] would have further testified as indicated by the Declaration that this was something completely unanticipated and which he understood to have been subject to an agreement between

Coast Bank and [Plaintiff] that would restrict this type of use.

**9.** Section II, Paragraph 7 of the Joint Pre–Trial Order explicitly states that an issue to be litigated at the subsequent hearing was: "Whether the MERCADOS concealed any material facts or circumstances from JOKAY, and if so, whether the MERCADOS had an obligation to disclose them."