**In re Leon J. OLINGER, Debtor.**

Claude GEHLHAUSEN, Laurena Gehlhausen, Eugene Gehlhausen, Virlee Gehlhausen, Jerome Hackman, Clara Mae Hackman, James Hagedorn, Eugene Hurst, Janice Hurst, Louis Kuczynski, Margaret Kuczynski, Melvin Menke, Janice Menke, David Ring, Kathy Ring, Kenneth R. Schaaf, Ennis Wesley Settle, and Dixie Settle, Plaintiffs,

v.

Leon J. OLINGER, Defendant.

Bankruptcy No. 92–70909–7.
Adv. No. 92–7065.

United States Bankruptcy Court,
S.D. of Indiana,
Evansville Division.

Oct. 6, 1993.

Gregory G. Meyer, Ziemer, Stamen, Weitzel & Shoulders, Evansville, IN, for plaintiffs.

Andrew D. Thomas, Evansville, IN, for defendant.

## ORDER

BASIL H. LORCH, III, Bankruptcy Judge.

This matter was initiated by the filing of a COMPLAINT in this matter on November 18, 1992. The defendant filed an ANSWER on January 8, 1993. This matter came before the Court for a trial in the adversary proceeding on May 17 and 18, 1993, at which time the matter was taken under advisement. The DEFENDANT'S BRIEF was filed on June 4, 1993. The plaintiffs filed a POST–TRIAL BRIEF on June 4, 1993.

Therefore, after having duly considered the foregoing as well as the record in this case, the relevant case law, statutory law, and other authority, the Court hereby FINDS THAT THE DEBT IN THE AMOUNT OF $65,000 IS NOT DISCHARGEABLE. The Court enters judgment in favor of the plaintiffs in the amount of $65,000 which the plaintiffs are to share, pro rata, based on the amount of their respective letters of credit. The parties are to confer, and within ten days of the date of this order, provide the Court with a document setting forth the amount which each plaintiff will be awarded. The defendant is further ordered to pay the court costs of this action.

IT IS SO ORDERED.

## MEMORANDUM

This matter was initiated by the filing of a COMPLAINT in this matter on November 18, 1992. The defendant filed an ANSWER on January 8, 1993. This matter came before the Court for a trial in the adversary proceeding on May 17 and 18, 1993, at which time the matter was taken under advisement. The DEFENDANT'S BRIEF was filed on June 4, 1993. The plaintiffs filed a POST–TRIAL BRIEF on June 4, 1993.

## FACTS

1. Yellow Banks Clay Products, Inc. [hereinafter Yellow Banks] was formed in the late 1970's or early 1980's, by the defendant and James Marshall. Yellow Banks was formed to process clay and pulverize the clay

to various degrees for use in fertilizer, and for use by soybean companies. A Mill was utilized to process the raw product into finished products which could be sold.

2. The company began conducting business in 1980, and began production in 1981.

3. The defendant served as an officer of Yellow Banks during the time that Yellow Banks was in business.

4. Yellow Banks originally obtained financing through First National Bank of Huntingburg [hereinafter First National]. In return, First National received a blanket security agreement in all of the assets of Yellow Bank. Additionally, the defendant and his wife personally guaranteed the note to First National and pledged personal assets to secure his contract of guaranty.

5. In 1984, it was determined that Yellow Banks needed to obtain a second Mill [High Side Roller Mill Flash Drying System] to serve as a back up and so that production could be increased.

6. To obtain financing for the second Mill, Yellow Banks approached Regional Federal Savings and Loan Association [hereinafter Regional]. Regional agreed to finance the purchase of the second Mill if they received a first lien on the Mill, and if letters of credit in favor of Regional were executed in a sufficient amount. First National agreed that they would subordinate their interest in the Mill to that of Regional. Several of the plaintiffs executed letters of credit in favor of Regional.

7. The plaintiffs who pledged letters of credit to secure the loan with Regional include: Claude and Laurena Gehlhausen, Eugene and Virlee Gehlhausen, James Hagedorn, Louis and Margaret Kuczynski, Melvin and Janice Menke, and Ennis and Dixie Settle. The defendant also guaranteed the loan up to the amount of $50,000. In return for the letters of credit, the plaintiffs received shares of stock in Yellow Banks. Regional extended Yellow Banks the sum of $500,000.

8. The plaintiffs identified in paragraph 7 relied on the representation of the defendant that the Mill would be held as collateral by Regional in agreeing to pledge their respective letters of credit to Regional. This representation was an important consideration on the part of the plaintiffs and the defendant emphasized the resulting limited liability when inducing the plaintiffs' participation.

9. In 1987, Yellow Banks decided that its overhead expenses were too high; as a result, Yellow Banks decided to attempt to obtain substitute financing at a lower interest rate to pay off the balance due on the Mill.

10. Thus, in 1987, the defendant and other officers approached Citizens National Bank [hereinafter Citizens] about refinancing the balance due on the Mill. Citizens indicated that it would extend Yellow Banks a loan. Although the Mill was offered as collateral to secure the loan, Citizens indicated that it did not wish to have the Mill pledged as collateral.

11. The defendant approached those plaintiffs who had pledged letters of credit to Regional and the additional plaintiffs about refinancing the loan through Citizens. Those plaintiffs who had not been part of the original financing with Regional were aware that the Mill had been pledged as collateral to secure the loan with Regional. The defendant indicated that Yellow Banks wished to refinance the note through Citizens so that the interest rate would be lowered. The defendant advised the plaintiffs that the terms of the refinancing with Citizens would be the same as the terms had been with Regional. The defendant did not advise any of the plaintiffs that the Mill would not be pledged as collateral to secure the Citizens loan.

12. The plaintiffs and the defendant pledged letters of credit to secure the note with Citizens. Except for the letters of credit, the note with Citizens was unsecured.

13. In 1989, Yellow Banks defaulted on its obligation to Citizens. In November of 1989, Citizens demanded and received payment from the plaintiffs based on their limited guarantees.

14. One of the effects of not having the Mill pledged as collateral to Citizens was that First National became the first lien holder on the Mill.

15. On March 7, 1990, the officers of Yellow Banks initiated a Chapter 11 bankruptcy proceeding in this Court. Pursuant to an order of the Court, the Mill was sold and the proceeds were turned over to First National. The lien held by First National was satisfied by the sale proceeds, and the Olinger's guaranty was released. This had the effect of releasing the mortgage on the defendant's residence which had been transferred to Mrs. Olinger.

16. The debtor initiated this Chapter 7 bankruptcy proceeding on August 28, 1992. The plaintiffs subsequently challenged the dischargeability of the debt.

## DISCUSSION

At the outset, the Court notes that it has jurisdiction over this matter pursuant to 28 U.S.C. § 157; 28 U.S.C. § 1344; and 11 U.S.C. § 523. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

The plaintiffs challenge the dischargeability of the debt pursuant to 11 U.S.C. § 523(a)(2)(A) and § 523(a)(4). Specifically, the plaintiffs contend that the debtor advised them that when the note was obtained from Citizens, that the mill would be pledged as collateral. However, Citizens did not want the note secured by the mill. Citizens preferred to call upon the letter of credit holders to satisfy the note upon default. According to the plaintiffs, this conduct bars discharge of the debt pursuant to section 523(a)(2)(A). The plaintiffs further contend that the defendant was in a fiduciary position, and breached his duty, thereby violating section 523(a)(4).

The defendant contends that the debt is dischargeable based on several theories. First, the defendant contends that the representation concerning the Mill is a statement regarding the debtor's or an insider's financial condition. As a result, the defendant argues that the statement falls within the purview of section 523(a)(2)(B) and must be in writing to be actionable. Since the representations were not in writing, the defendant asserts that the debt is dischargeable since there is not an actionable cause under section 523(a)(2)(A). Additionally, the defendant contends that the representations he made

were not false. Finally, the defendant argues that he is not a fiduciary and there is not an express trust. As a result, the debtor asserts that discharge of the debt is not barred under section 523(a)(4).

### SECTION 523(a)(2)(A) vs. SECTION 523(a)(2)(B)

Pursuant to section 523(a)(2)(A), a debt is not discharged if that debt is for "money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." Alternatively, section 523(a)(2)(B) prevents discharge:

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by—

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, or services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive.

"Subparagraph (A) is mutually exclusive from subparagraph (B)." 124 Cong.Rec. H11095–96 (daily ed. Sept. 28, 1978); S17412 (daily ed. Oct. 6, 1978). *Jokay Co. v. Mercado (In re Mercado)*, 144 B.R. 879 (Bkrtcy. C.D.Cal.1992); *Connecticut National Bank v. Panaia (In re Panaia)*, 61 B.R. 959 (Bkrtcy.S.D.Ohio 1986). Thus, the Court must first determine which of the two statutes is applicable to the facts in this adversary. This question will be resolved by a determination of whether or not the representations made to the plaintiffs constitute statements which concern the debtor's or an insider's financial condition.

The term "financial condition" is not defined in the Bankruptcy Code, however, several courts have addressed the correct interpretation of the phrase. There are two schools of thought regarding the correct interpretation of the term financial condition.

One school holds that the term "statement respecting the debtor's or an insider's financial condition" is to be strictly construed. The second view holds that a more expansive definition of the term financial statement should be adopted. For the reasons set forth below, the Court finds that the better view is that the more restrictive school of thought should be adopted.

The first view rules that the term statement respecting a debtor's or insider's financial condition should be narrowly interpreted. In the *Mercado* case, a limited partnership entered into an agreement with the debtors to purchase the debtors' interest in real estate. An apartment complex was to be constructed on the property, and the debtors were to oversee the construction phase of the project. The limited partnership advanced the debtors their portion of the funds necessary to complete the project. Numerous liens existed on the property the existence of which the debtors did not reveal to the partnership. The debtors had not been delinquent in their payments for a long period of time, therefore, the cloud did not appear on the title report obtained by the partnership. The partnership lost the property due to a foreclosure sale, and the debtors filed a voluntary Chapter 11 Bankruptcy.

The partnership challenged the dischargeability of the debt pursuant to section 523(a)(2)(A). The court found that the debt was nondischargeable, and the debtors sought a new trial arguing that only section 523(a)(2)(B) was applicable since the representation was a statement which concerned the debtors' or an insider's financial condition, and thus, had to be in writing. Since there was no written document, the debtors contended that the debt was dischargeable. The court rejected this argument, holding:

> Additionally, Debtor represented that with the Funds, the project could be completed, free and clear of liens, by June 1988. Debtor testified as to how the funds were supposed to be used. Debtor knew that the Bank had not been paid loan interest for February and March, yet nowhere in his testimony concerning how the funds were to be used did Debtor disclose a provision to bring the Bank current on the

$20,000 arrearage. Based on his knowledge that at least an additional $20,000 would be necessary to bring the Bank current, Debtor knew that it was likely to be impossible to complete the Project for $250,000. Debtor argues that these additional misrepresentations relate to his financial condition for purposes of § 523(a)(2)(B). In support, Debtor relies on *In re Phillips*, 27 B.R. 646 (Bankr. M.D.Pa.1982) and *In re Van Steinburg*, 744 F.2d 1060 (4th Cir.1984).

In *Phillips*, debtors had applied to a bank for a loan. 27 B.R. at 646. To secure the loan, debtor executed a security agreement which did not specify what property was given as collateral. The debtors allegedly orally represented that the equipment was unencumbered. *Id.* In deciding that the issue of dischargeability should be determined under § 523(a)(2)(B), the court concluded that "[s]ince the instant case is a dispute regarding the debtors' encumbrances on their assets, this is a matter which concerns the financial condition of the debtors. . . ." *Id.* at 647.

In *Van Steinburg*, a debtor induced a creditor to loan $5,500 by orally assuring him that the loan would be secured by a first priority security interest in certain property. 744 F.2d at 1060. The court held that the oral representations concerning the encumbrances against the property must be in writing to bar the debtor's discharge. *Id.* at 1061 (citing *Blackwell v. Dabney*, 702 F.2d 490 (4th Cir.1983)). In arriving at its conclusion, the court reasoned that,

> [c]oncededly, a statement that one's assets are not encumbered is not a formal financial statement in the ordinary usage of that phrase. But Congress did not speak in terms of financial statements. Instead it referred to a much broader class of statements—those "respecting the debtor's . . . financial condition." A debtor's assertion that he owns certain property free and clear of other liens is a statement respecting his financial condition. Indeed, whether his assets are encumbered may be the most significant information about his financial condition.

*Id.* at 1060–61.

The court's reliance on congressional intent in *Van Steinburg* is strained. The court in *Van Steinburg* fails to cite the language it relies upon to conclude that Congress intended § 523(a)(2)(B) to apply to a broad class of statements. However, based on Representative Edwards and Senator DeConcini's comments in the House Report, it seems more plausible that Congress intended application of § 523(a)(2)(B) to be limited to "the so-called false financial statement." While a financial statement under § 523(a)(2)(B) may not require the formalities of an audited balance sheet or income statement, nothing in the legislative history indicates that § 523(a)(2)(B) should be expanded beyond statements about a debtor's net worth or overall earning capacity. Thus, the legislative history does not support the holding in *Van Steinburg* . . . .

Lastly, *Phillips* and *Van Steinburg* are distinguishable on the facts from this situation. In those proceedings, each debtor was attempting to obtain loans and the overall financial condition of each was extremely relevant to the lender in granting the loan. In that circumstance, a misrepresentation regarding a material asset that would effect the evaluation of the overall financial condition of the debtor certainly fits within the parameters of § 523(a)(2)(B). However, that is not the situation here. Plaintiff was interested in the financial condition of the Property. Plaintiff was not relying upon the overall financial condition of the Debtor. Plaintiff was willing to purchase the Property provided construction could be completed within a certain time period, at a specified cost and title could be transferred free and clear of all liens. The overall financial condition of Debtor was irrelevant to the transaction. Yet, the status of the Property did affect the overall financial condition of Debtor, but this was neither the focus nor the purpose of the inquiry. Plaintiff was not relying on Debtor's financial capacity for completion of the Project. Rather, Plaintiff was relying on the financial condition of the Property, Debtor's promise to complete the Project within two months and Debtor's representation as to the funds necessary for completion. Therefore, I decline to follow the rationale of *Phillips* and *Van Steinburg.*

I agree with the reasoning set forth in *Pollina* [31 B.R. 975 (D.C.N.J.1983) ] and *Seaborne* [106 B.R. 711 (Bkrtcy.M.D.Fla. 1989) ] concerning the scope of § 523(a)(2)(B). The ordinary usage of "statement" in connection with "financial condition" denotes either a representation of a person's overall "net worth" or a person's overall ability to generate income. Debtor's statements regarding the Property's total encumbrances and the status of construction did not concern his financial condition. Rather, the statements concerned the financial condition and physical status of the Property. Plaintiff did not insist on a guaranty from Debtor nor did it ask for personal financial statements, because neither were relevant to the transaction. Plaintiff was not interested in the Debtor's financial condition when it purchased Debtor's interest in the Property. Plaintiff only wanted to know how much it would cost to complete the Project within two months, and how much would clear the liens against the Property. Since these statements do not concern Debtor's overall net worth or earning capacity, they are not statements of financial condition. Therefore, § 523(a)(2)(A) was properly applied.

*Mercado,* 144 B.R. at 882–883 (footnotes omitted).

Similarly, in the case of *City Federal Savings Bank v. Seaborne (In re Seaborne),* 106 B.R. 711 (Bkrtcy.M.D.Fla.1989), the debtor was a member of a limited partnership. The debtor sought a loan from City Federal, the proceeds of which would be utilized by the limited partnership to purchase an office building. City Federal agreed to advance the funds so long as the debtor could deliver partnership participation certificates, which would obligate at least one-half of the building's tenants to become limited partners. The debtor delivered these documents, among others, to City Federal. Although the debtor delivered the requisite amount of partnership participation certificates, the debtor was aware that some of the "limited partners" had no intention of making pay-

ments to the limited partnership as required by the lease. Thus, less than fifty percent of the tenants had the intent to become limited partners. City Federal foreclosed on the property, but sought a deficiency judgment from the debtor after he initiated his bankruptcy proceeding.

Seaborne argued that the debt was dischargeable since it related to his or an insider's financial condition, and therefore, must be in writing to be actionable. The court rejected the argument, holding:

> Section 523(a)(2)(B) pertains to a false financial statement denoting the financial condition of the debtor or an insider. Rep Edwards and Sen. DeConcini stated in the Congressional Record Statements (Reform Act of 1978):
>
> > . . . Subparagraph (A) is mutually exclusive from subparagraph (B). Subparagraph (B) pertains to the so-called false *financial statement.* In order for the debt to be nondischargeable, the creditor must prove that the debt was obtained by use of a statement in writing (i) that is materially false; (ii) respecting the debtor's or an insider's financial condition; (iii) on which the creditor to whom the debtor is liable for obtaining money, property, services, or credit reasonably relied; (iv) that the debtor caused to be made or published with intent to deceive . . . (emphasis added).
>
> 124 Cong.Rec. H11095–96 (daily ed. Sept. 28, 1978); S17412 (daily ed. Oct. 6, 1978); *reprinted in* Norton, *Norton Bankruptcy Law And Practice,* 397–398 (1988–1989). Section 523(a)(2)(B) is meant to pertain to a specific type of financial statement, one that specifically states a debtor's or insider's net worth. *See e.g., Brigadier Homes & U.S. Homes Acceptance Corp. v. Hert,* 81 B.R. 638 (Bankr.N.D.Fla.1987). In addition, the financial statement need not be a formal financial document such as commercial or banking institutions require, but a type of financial statement describing the financial condition of the debtor. *Household Finance Corp. v. Howard (In re Howard),* 73 B.R. 694, 702 (Bankr.N.D.Ind. 1987), citing *Butler v. Roberts (In re Roberts),* 54 B.R. 765, 770 (Bankr.N.D.1985).

> While it is true the closing documents were being used to denote [the limited partner's] financial condition in the broadest sense, they are not literal nor actual financial statement denoting the Debtor's financial condition as Congress intends. Thus, the misrepresentations in the closing document fall in the general category of fraud in Section 523(a)(2)(A), "fraudulent misrepresentations *other* than a *statement* respecting the debtor's or an insider's financial condition." Therefore, City Federal's complaint is sufficient under Bankruptcy Code Section 523(a)(2)(A).

*Seaborne,* 106 B.R. at 713—714.

In the case of *Bal–Ross Grocers, Inc. v. Sansoucy (In re Sansoucy),* 136 B.R. 20 (Bkrtcy.D.N.H.1992), the debtor made various misrepresentations to the plaintiff regarding the status of his mortgage, the status of leased premises, the financial solvency of his limited partnership, the status of the roof and the electrical service. The debtor argued that the misrepresentations concerned his financial condition, and thus had to be in writing to be actionable. The court agreed that the statement regarding the solvency of the partnership was actionable, but rejected the remainder of the argument. Specifically, the court held:

> "Financial condition" is not a defined term in the Code. Presumably, when Congress enacted the Bankruptcy Code, it intended that both § 523(a)(2)(A) and (B) operate in a complementary way. This cannot be done if § 523(a)(2)(B) is read as the debtor argues in both its motion to dismiss and its motion for reconsideration. Such a reading would "compel an odd result" making it unreasonable to believe the Congress intended such an outcome. . . .

> Both § 523(a)(2)(A) and (B) remain in full force if the phrase "financial condition" is given its normal commercial meaning, i.e., an *equation* of assets and liabilities and not a statement about the condition or quality of a single asset or liability. Stated otherwise, the Court finds that a "statement of a debtor's or an insider's financial condition" as used in § 523(a)(2)(B) means a balance sheet and/or profit and loss statement or other accounting of an entity's overall fi-

nancial health and not a mere statement as to a single asset or liability. *See In re Pollina*, 31 B.R. 975, 978 (D.N.J.1983).

It is true that all the reported decisions to date tend to support the defendant's view that a statement which misrepresents the status of a single asset or liability is a statement of financial condition and therefore must be in writing to be actionable under the Code. *See, e.g. In re Steinburg*, 744 F.2d 1060 (4th Cir.1984); *In re Prestridge*, 45 B.R. 681 (Bankr.W.D.Tn.1985); *In re Panaia*, 61 B.R. 959 (Bankr.D.MA. 1986); *but cf. In re Pollina*, 31 B.R. 975 (D.N.J.1983). *Pollina* in dicta noted that an oral misrepresentation that certain collateral was free and clear of any liens was actionable under 523(a)(2)(A). *Pollina*, 31 B.R. at 977. Despite the contrary case law, and based on the facts as alleged in the complaint here, this Court adopts the *Pollina* reasoning because it resolves the conflict raised in the present case in a way that reconciles 523(a)(2)(A) and (B) without rendering either a nullity.

Under the definition of "financial condition" as an equation of assets and liabilities, and not just one aspect of that equation, it becomes apparent that the clause in paragraph number five of the complaint alleging that the debtor made an oral misrepresentation as to the financial solvency of the partnership owning the property is such a statement of financial condition in that it includes a representation as to the overall economic condition of the partnership. . . .

At the same time, it is clear that the allegations contained in the plaintiff's complaint relating to the status of the mortgage, status of leased premises, status of the electrical metering system, and the status of the roof are all non-financial condition representations actionable under § 523(a)(2)(A).

*Id.* at 22–23.

The Court is aware that the many of the cases dealing with this issue have construed the term financial condition as refering to a broader range of statements. *See Engler v. Van Steinburg (In re Van Steinburg)*, 744 F.2d 1060 (4th Cir.1984) (Representation that livestock and farm implements were not encumbered must be in writing to be actionable); *Blackwell v. Dabney (In re Blackwell)*, 702 F.2d 490 (4th Cir.1983) (Statements that a company was top-notch, that it was successful, doing well and blooming is not actionable unless in writing since it was a statement concerning the debtor's or an insider's financial condition); *Harper v. Richey (In re Richey)*, 103 B.R. 25 (Bkrtcy.D.Conn.1989); *In re Prestridge*, 45 B.R. 681 (Bkrtcy. W.D.Tn.1985); *In re Panaia*, 61 B.R. 959 (Bkrtcy.D.Ma.1986). However, the cases construing the term financial condition more broadly have not set forth persuasive reasoning to support that viewpoint. Thus, after considering the wording of both sections, the legislative history, and the case law, the Court adopts that view set forth by *Pollina* and its progeny. A more narrow construction would result in many plaintiffs being left without a cause of action if they did not have the foresight to require a written statement in situations that normally do not require one.

*APPLICATION OF SECTION 523(a)(2)(A)*

 Now that the Court has determined that section 523(a)(2)(A) is applicable to the facts *sub judice*, the Court must apply that section. As previously stated, pursuant to section 523(a)(2)(A), a debt is not discharged if that debt is for "money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." The Seventh Circuit has held that:

> To succeed on a claim that a debt is nondischargeable under section 523(a)(2)(A), a creditor must prove three elements. First, the creditor must prove that the debtor obtained the money through representations which the debtor either knew to be false or made with such reckless disregard for the truth as to constitute a willful misrepresentation. The creditor also must prove that the debtor possessed scienter, *i.e.*, an intent to deceive. Finally, the creditor must show that it actually relied on the false representation, and that its reliance was reasonable.

*In re Kimzey,* 761 F.2d 421, 423 (7th Cir. 1985). The burden is on the plaintiffs to establish the existence of these three elements. *Id.* at 424. The plaintiffs must establish these elements by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 287–88, 111 S.Ct. 654, 659–60, 112 L.Ed.2d 755, 765 (1991). However, exceptions against dischargeability should be narrowly construed against the creditors' objections. *In re Schmidt,* 70 B.R. 634 (Bkrtcy. N.D.Ind.1986).

First, the plaintiffs must show that the debtor obtained the money through representations known by the debtor to be false or which were made with such reckless disregard as to constitute a willful misrepresentation. In the *Kimzey* case, the debtor had argued that the creditor had lent him money to purchase the items to supply sales orders. However, based on the evidence presented by the creditor, the court found that the creditor had agreed to lend the debtor money for accounts receivable, that is for money due from customers to whom merchandise had already been shipped. The court then found that presenting the bank with purchase orders for merchandise which had not yet been shipped constituted a false representation for purposes of section 523(a)(2)(A).

The creditor challenged the dischargeability of a debt in the case of *Farina v. Balzano (In re Balzano),* 127 B.R. 524 (Bkrtcy. E.D.N.Y.1991). The creditor obtained funds by executing a second mortgage on her home and then deposited them into a joint account to which the debtor had unlimited access. According to the creditor, the debtor promised to marry her, indicated that the funds would only be used to pay his debt to the IRS, and promised to repay the loan. The court rejected the section 523(a)(2)(A) argument, finding:

> Plaintiff loaned monies to Defendant in October 1988 when she refinanced her home and opened up a joint account with Defendant. At that time or earlier, Defendant orally agreed to pay back the loan. A bare promise to be fulfilled in the future, which is not carried out, does not render a consequent debt nondischargeable under § 523(a)(2)(A). *Schwalbe v. Gans (In re*

*Gans),* 75 B.R. 474, 486 (Bankr.S.D.N.Y. 1987). An unfulfilled promise to perform in the future is actionable only in contract. It is insufficient under § 523(a)(2)(A) simply to show that debtor left unfulfilled a prior oral representation or promise. Were this showing sufficient, virtually every oral obligation would give rise to nondischargeable debt under § 523(a)(2)(A). A fraudulent promise under § 523(a)(2)(A) requires proof that at the time the debtor made it, he or she did not intend to perform as required. *Seepes v. Schwartz (In re Schwartz),* 45 B.R. 354, 357 (Bankr. S.D.N.Y.1985). In other words, Plaintiff must establish that Defendant had no intention of repaying when he obtained the loan and she has failed to do so.

*Id.* at 531.

Finally, in the *Mercado* case discussed above, erroneous statements regarding the amount for which a project could be completed and the omission of the fact that the property was subjected to liens which were in default were held to constitute false statements pursuant to section 523(a)(2)(A). *Mercado,* 144 B.R. at 883. *See also McMillen v. Jarmul (In re Jarmul),* 150 B.R. 134 (Bkrtcy.W.D.Pa.1993); *Visotsky v. Woolley (In re Woolley),* 145 B.R. 830 (Bkrtcy. E.D.Va.1991); *Sunbank/North Florida National Assoc. v. Podzamsky (In re Podzamsky),* 141 B.R. 770 (Bkrtcy.M.D.Fla.1992).

The failure to disclose a material fact can constitute misrepresentation. *In re Guy,* 101 B.R. 961 (Bkrtcy.N.D.Ind.1988). "[F]raud may consist of silence, concealment or intentional non-disclosure of a material fact, as well as affirmative misrepresentation of a material fact." *Id.* at 978.

In the case at bar, the plaintiffs contend that the debtor represented that the Mill would be pledged as collateral when the note was refinanced with Citizens. This was not a direct representation, rather, the debtor indicated that the terms of the Citizens note would be the same as they had been with Regional. The Mill was pledged as collateral to secure the note with Regional and many of the plaintiffs testified that the limited liability provided by the collateral

was a major consideration in their determination to participate in the financing of the Mill. The debtor denied having made such a representation at the time of the refinancing, and stated that the plaintiffs did ask him if the terms were the same. The Court had the opportunity to listen to the testimony and evaluate the credibility and demeanor of the witnesses. The Court finds that the debtor did in fact misrepresent the terms of the Citizens note, and advised the plaintiffs that the Mill would be pledged as collateral. Had the plaintiffs known that the Mill would not have been pledged as collateral, the plaintiffs would not have guaranteed the note with Citizens.

The next element which must be shown is that the debtor intended to deceive the plaintiffs with his representations. "As for the scienter element of a section 523(a)(2)(A) claim, an intent to deceive may logically be inferred from a false representation which the debtor knows or should know will induce another to make a loan." *Kimzey*, 761 F.2d at 424. In the *Balzano* case, the court found that the creditor had failed to establish fraudulent intent on the part of the debtor. Specifically, the court ruled that:

> We recognize that fraudulent intent, intent to deceive or scienter can be inferred, since direct proof of state of mind is rarely available. Plaintiff, however, errs in assuming fraudulent intent can be presumed. Fraudulent intent may be inferred; it cannot be presumed. Such inference is negated, where, as here, the Defendant made payment for approximately a year, and filed his Chapter 7 petition only after he reached the point where he could no longer do so and was unsuccessful in negotiations with Plaintiff to reduce the payments. Where a debtor makes payment to the lender, courts will consider this evidence as indicative of a debtor's lack of fraudulent intent.... *Trumbull Building Center, Inc. v. Buttendorf (In re Buttendorf)*, 11 B.R. 558, 561 (Bankr.D.Vt.1981) ("His promise to make payment to the Plaintiff appeared to be in good faith but, like all debtors who find themselves in financial straits, hope sprung eternal and he was looking at the light at the end of the tunnel which was not visible. He was thwarted in his efforts by continuing reverses.").

*Id.* at 531.

The plaintiffs also specified that had the Mill not been pledged as collateral, they would not have executed letters of credit. The debtor was aware of the plaintiffs' feeling since he arranged the financing with Regional. Thus, the Court finds that the plaintiffs have established the debtor intended to deceive the plaintiffs by failing to reveal the pertinent fact that the Mill would not be pledged as collateral when the note was refinanced. Additionally, the Court notes that the defendant and his wife were directly benefited when the Mill was refinanced and Citizens did not accept the Mill as collateral. As a result, First National, the bank holding their personal guarantees and the mortgage on their residence, became first in priority with respect to the Mill. When the Mill was sold, First National received the proceeds and the Olinger's liability was released.

Finally, the plaintiffs must establish that they actually relied on the misrepresentations. The question is whether there is factual support in the record for a determination that the plaintiffs actually and reasonably relied on the financial statement in extending credit. *In re Schoeff*, 116 B.R. 119 (Bkrtcy.N.D.Ind.1990); *In re Ruwart*, 114 B.R. 725 (D.Colo.1990).

> Whether or not reliance was reasonable is a factually sensitive inquiry.... It is measured against an objective standard, which considers the degree of care that would be exercised by a reasonably cautious person in a similar transaction under similar circumstances.... The inquiry can involve such things as the amount and adequacy of the information given or requested, the nature and circumstances of the loan, the past relationship, if any, between creditor and debtor, the amount of the loan itself, the sophistication of the lender, its normal lending practices and the custom of the industry....
>
> "Numerous bankruptcy court cases stand for the proposition that a bank must conduct a reasonable investigation as to the accuracy of the debtor's representations."

*In re Ward,* 857 F.2d 1082, 1084 n. 2 (6th Cir.1988). (citations omitted). Thus, the court should also consider the nature of the information given and the ease with which it can be verified.

*Schoeff,* at 121.

Were it not for the fact that the plaintiffs had dealt with the defendant for a number of years, the Court would seriously question the reasonableness of the plaintiffs' reliance on the defendant's representations. However, in this case the plaintiffs had dealt with the defendant for a number of years, and the majority of the plaintiffs were good friends with the defendant. In the previous encounters, the plaintiffs had been able to rely on the representations made by the defendant. The plaintiffs will not be penalized for not investigating the situation further, and their reliance on the debtor's representations is found to be reasonable based on the totality of the circumstances. Thus, since all of the elements are met, the debt is found to be nondischargeable pursuant to section 523(a)(2)(A).

## EQUITABLE SUBORDINATION

The defendant also contends that the refinancing did not injure the status of the plaintiffs. According to the defendant, if Yellow Banks had defaulted on the loan with Regional, the letters of credit would have been called and the lien held by First National would have become first in priority with respect to the Mill. Under this theory, the plaintiffs would have had an interest which was inferior to that of First National even if the refinancing had not occurred. The argument, as advanced by the defendant, ignores the doctrine of equitable estoppel.

■ Under the doctrine of equitable subordination, if a guarantor is called upon to pay the debt of the principal, the guarantor steps into the shoes of the creditor who was paid off. *Homeowners Loan Corp. v. Henson,* 217 Ind. 554, 29 N.E.2d 873 (1940); *White v. Household Finance Corp.,* 158 Ind. App. 394, 302 N.E.2d 828 (1973); 38 *Am.Jur.* "Guaranty" § 127. The guarantor's interest also attaches to any security which the creditor does or could have obtained from the principal. *White,* 302 N.E.2d 828. Thus, the

fact that the terms of the refinancing differed from the terms present with Regional financing did adversely affect the plaintiffs' position.

### SECTION 523(a)(4)

■ Pursuant to section 524(a)(4), an individual is not discharged from any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." To establish that the debt is not dischargeable under section 523(a)(4), the creditors must show:

1) an express trust existed,

2) the debt was caused by fraud or defalcation, and

3) the debtor acted as a fiduciary to the creditors at the time the debt was created.

*Harasymiw v. Selfreliance Federal Credit Union (In re Harasymiw),* 97 B.R. 924 (N.D.Ill.1989), *aff'd* 895 F.2d 1170; *Klingman v. Levinson,* 831 F.2d 1292, 1295 (7th Cir.1987). The creditors must establish these elements by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 287–88, 111 S.Ct. 654, 659–60, 112 L.Ed.2d 755, 765 (1991). It must be remembered that exceptions against dischargeability should be narrowly construed against the creditors' objections. *In re Schmidt,* 70 B.R. 634 (Bkrtcy.N.D.Ind.1986).

The first element which must be established is that an express trust existed. "The 'usual elements of an express trust have traditionally included an explicit declaration of trust, a clearly defined trust *res,* and an intent to create a trust relationship.'" *Harasymiw,* 97 B.R. at 926. *See also In re Thornton,* 544 F.2d 1005 (9th Cir.1976); *In re Janikowski,* 60 B.R. 784, 789 (Bkrtcy. N.D.Ill.1986). In the *Harasymiw* case, the debtor was a vice-president and director of the Credit Union at the time she applied for a sizeable loan. The debtor pledged property as collateral which was subject to several preexisting mortgages. The debtor revealed the existence of some of the mortgages, but failed to advise the Credit Union of an additional encumbrance which caused the debtor to have no equity in the property. The Credit Union argued that the debtor's con-

duct constituted fraud or defalcation while acting in a fiduciary capacity. The court rejected this argument, finding "[t]here is no evidence in this case that the money on which the debt is based was *entrusted* to Harasymiw." *Id.* at 926.

■ In the present controversy, the debtor was in charge of arranging financing which offered a lower interest rate. The debtor was able to arrange the loan if the plaintiffs were willing to execute letters of credit. This situation is not sufficient to create an express trust. The debtor was not entrusted with any funds. Rather, he was placed in charge of obtaining a refinancing of credit.

The plaintiffs must also establish that debtor was acting as a fiduciary to the creditor at the time the debt was created. Whether or not a debtor was acting in a fiduciary capacity is a matter of federal law. *In re Schwenn*, 126 B.R. 351 (D.Colo.1991). An officer of the corporation does not create a fiduciary relationship between the officer and shareholders. *In re Nayee*, 99 B.R. 90 (Bkrtcy.M.D.Fla.1989). Since the Court finds that an express trust did not exist, and that the debtor was not a fiduciary, it is not necessary to address whether or not a fraud or defalcation occurred.

### DAMAGES

■ The issue of damages must also be addressed. The question is whether the plaintiffs are entitled to a judgment which represents the amount which they guaranteed or an amount which represents the value of the collateral at the time the default occurred and the letters were called. In the case of *Friendly Finance Service Mid–City, Inc. v. Modicue (In re Modicue)*, 926 F.2d 452 (5th Cir.1991), the creditor argued that the value of the collateral at the time it was pledged should be the appropriate measure of the amount of the debt which is not dischargeable. The court rejected this argument, holding:

> The bankruptcy court and district court correctly concluded that the appropriate measure of the non-dischargeable injury is the fair value at the time the property was sold. As the district court reasoned, any

other measure would put Friendly "in a better position because of defendant's misconduct than it would otherwise have enjoyed, [Friendly's] actual loss is the value of the collateral had (sic) at the time of the wrongful sale." *See First State Bank of Alsip v. Iaquinta*, 98 B.R. 919 (Bankr. N.D.Ill.1989).

*Id.* at 453.

The better reasoned point of view is that the plaintiffs are entitled to a determination that only that portion of the debt representing the value of the collateral at the time of the wrongful conduct on the part of the debtor caused injury to the plaintiffs should not be discharged. If the terms of the Citizens financing would have been the same as they were with Regional, the plaintiffs would have been entitled to step into the shoes of Citizens with respect to the Mill. Thus, the plaintiffs are entitled only to an amount which represents the value of the Mill at the time of the default and foreclosure sale.

Hugh Miller of Curran Miller Auction and Realty testified about the value of the Mill. Mr. Miller testified that, in 1989, the Mill was valued between $50,000 and $80,000 when taking the cost of moving the Mill and performing those repairs necessary to bring the Mill to an operational condition. Mr. Miller testified that his valuation was based on what a purchaser would pay for the Mill without taking the installation costs into consideration. Based on the testimony of Mr. Miller, and the record in this case, the Court finds that a proper valuation of the Mill is $65,000. The plaintiffs are to share in the judgment pro rata, based on the amount of their respective letters of credit. The parties are to confer, and within ten days of the date of this order, provide the Court with a document setting forth the amount which each plaintiff will be awarded.

### CONCLUSION

The Court finds that the more restrictive view of what constitutes a statement regarding the debtor's or an insider's financial condition should be adopted. Thus, a false statement concerning the encumbrance of a single asset is actionable pursuant to section

**1016**

523(a)(2)(A). The plaintiffs established the requisite elements necessary to sustain a section 523(a)(2)(A) challenge to dischargeability. The doctrine of equitable subordination would have placed the plaintiffs in the shoes of Citizens had the terms of the financing remained the same as they had been with Regional. The Mill is properly valued at $65,000; this is the amount which the Court holds is not dischargeable. The plaintiffs will share in the $65,000 judgment on a pro rata basis, each share is to be computed by reference to the amount which was guaranteed in the respective letters of credit. The parties are to confer, and within ten days of the date of this order, provide the Court with a document setting forth the amount which each plaintiff will be awarded.

Therefore, after having duly considered the foregoing as well as the record in this case, the relevant case law, statutory law, and other authority, the Court hereby FINDS THAT THE DEBT IN THE AMOUNT OF $65,000 IS NOT DISCHARGEABLE. The Court enters judgment in favor of the plaintiffs in the amount of $65,000 which the plaintiffs are to share, pro rata, based on the amount of their respective letters of credit. The parties are to confer, and within ten days of the date of this order, provide the Court with a document setting forth the amount which each plaintiff will be awarded. The defendant is further ordered to pay the court costs of this action.

IT IS SO ORDERED.