**In re William G. BOOKER, Debtor.**

**John J. O'CONNOR, CPO, Inc. and John J. O'Connor and Patricia M. O'Connor for John J. O'Connor, CPO, Inc. Pension Plan, Plaintiffs,**

v.

**William G. BOOKER, Defendant.**

Bankruptcy No. B–91–15449 C–7W.
Adv. No. A–92–2135.

United States Bankruptcy Court,
M.D. North Carolina,
Greensboro Division.

March 24, 1994.

Peter J. Juran, House & Blanco, Winston–Salem, NC, for plaintiffs.

Robert E. Price, Jr., Burns and Price, Winston–Salem, NC, for defendant.

## MEMORANDUM OPINION

JERRY G. TART, Bankruptcy Judge.

This case concerns whether William G. Booker should be granted a discharge for loans made for investment purposes by John J. O'Connor, CPO, Inc. and John J. O'Connor and Patricia M. O'Connor as trustees of the John J. O'Connor, CPO, Inc. Pension Plan (collectively referred to as "the O'Connors") to Lambie Investments, Inc. ("Lambie Investments"). This Court finds that these

debts are nondischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(A) and (a)(4).

## STATEMENT OF FACTS

Mr. Booker was a director and co-founder of Lambie Group Ltd. ("the Lambie Group"), which was founded for the purpose of factoring accounts receivable for temporary employment agencies throughout the country. Mr. Booker and several others formed Lambie Investments for the stated purpose of raising money to fund receivables being factored by the Lambie Group.[1] Mr. Booker acted as accountant and officer and had full control over the operation and finances of both entities.

Within days of the formation of Lambie Investments, Mr. Booker approached the O'Connors soliciting them to invest in the company. The O'Connors had used Mr. Booker as a trusted CPA and financial advisor for 8 years. Mr. Booker represented to the O'Connors that the purpose of Lambie Investments was to raise money to enable the Lambie Group to fund the factoring of accounts receivable of temporary agencies, and he assured the O'Connors that their money would go to Lambie Investments and then to the Lambie Group. He further represented that the Lambie Group had been very successful in the factoring business. Based on Mr. Booker's positive recommendations, the O'Connors loaned a total of $140,000 to Lambie Investments and received in exchange two promissory notes bearing interest at 18%.[2] The first note, in the principal amount of $65,000, came due in December of 1990, but has not been paid. Both the Lambie Group and Lambie Investments are now defunct, and there is no reasonable prospect of either note being paid. ·

Mr. Booker, using his complete control over both companies, frequently intermingled funds between Lambie Investments, the Lambie Group, his personal account, and the accounts of other businesses under his control. These transfers regularly were in the hundreds of thousands of dollars and took place on an almost daily basis. There is no documentation or records which exist establishing any business purpose for the transfers or any authorization from any other officer or director of either Lambie Investments or the Lambie Group. Furthermore, Mr. Booker's accounting firm received fees of approximately $12,000 for his services to the company during 1990. The intermingling of funds, the lack of corporate formalities, the severe undercapitalization, and the complete control exercised by Mr. Booker make it clear that both corporations were no more than his alter egos.

As of September 4, 1990, Mr. Booker was owed $30,354.38 by the Lambie Group. In early, September, the O'Connors infused $140,000 into the corporation, and Mr. Booker immediately repaid himself from company funds, and, in addition, overpaid himself $15,732.42.[3] Mr. Booker thereby established himself as a debtor of the corporation. Transfers from the Lambie Group to Mr. Booker in the month of September, 1990, totalled $1,137,938.60.[4] This amount exceeded checks written from Mr. Booker to the Lambie Group by $90,741.79. Neither the facts of these transfers nor the actual intended use of the O'Connor's invested money was reported to the O'Connors.

In addition to his misrepresentation as to the intended use of the O'Connor funds, Mr. Booker utilized outdated projections in per-

---

1. Both corporations were severely under-capitalized when founded. Mr. Booker testified that, while he expected to factor accounts receivable for businesses across the country, each corporation's initial capital investments were minimal.

2. The first note had a term of 90 days and was made payable to Jon J. O'Connor, CPO, Inc. in the principal amount of $65,000. The second note had a term of 5 years and was payable to the pension fund in the principal amount of $75,000.

3. The check Mr. Booker wrote to himself had previously been returned for insufficient funds on

September 4th. The O'Connors' checks were given to Mr. Booker on September 7th. Mr. Booker resubmitted the check written to him, and it cleared. It is clear that Mr. Booker received the funds from the O'Connors with the intent to convert the funds to his own use rather than for funding the needs of the Lambie Group.

4. Whenever Mr. Booker was owed money by either company, he charged interest on those debts. However, when money was owed by him to those organizations, he never paid interest.

suading the O'Connors to make this investment. Using cash flow projections from April of 1990, he solicited the O'Connors' investment in early September of 1990, even though more recent and accurate financial information should have been available. Although the testimony was contradicted on these points, the Court finds that Mr. Booker gave a copy of the April projections to the O'Connors and represented it as a document showing the actual financial position of the Lambie Group. He assured them that the venture was barely a year old and already extraordinarily successful. He represented that the venture had extremely low risk, because temporary employees were always in demand in any economic scenario.

After considering Mr. Booker's presentation for a few days, and consulting with the advisor of their retirement plan who expressed concern about the investment, the O'Connors decided to invest in the enterprise in reliance on Mr. Booker's statements. Although testimony was again contradicted at this point, the Court finds that Mr. Booker presented the O'Connors a letter purporting to be a waiver of claims against him for his possible conflicts of interest in this matter three days after the O'Connors wrote and delivered to him checks totalling $140,000. He specifically stated to them that the waiver letter was "just a formality" and "not legally binding" and asked that all documents be back-dated to before the delivery of the checks. Again, relying on Mr. Booker, Mr. and Mrs. O'Connor complied with his request.

On December 6, 1990, the first promissory note from Lambie Investments came due. By this time the company was suffering from substantial collection problems and was well under its cash-flow projections. He did not reveal this information to the O'Connors, but instead told them that the money was safe and would continue to earn interest at 18%. Mr. Booker asked them to roll over their investment, and in reliance on his representations, the O'Connors did so. At that time, Mr. Booker's debt to the company was of a sufficient amount that, if he had repaid the company, Lambie Investments would have had sufficient funds to pay off the note.

The Lambie Group did not reach its sales growth targets and had never shown any significant profit as of the date Mr. Booker solicited the investment by the O'Connors. Notwithstanding this, and realizing the O'Connors would rely on his knowledge of their finances and on his recommendations, he urged them to make a quick decision, obtaining the investment in a few days. Further, Mr. Booker told them there was no need to seek legal advice, and encouraged an immediate investment. At no time did Mr. Booker disclose the level of control he was exercising over the funds, the complete intermingling of funds between the companies, his personal accounts, and other accounts over which he had control, the lack of profitability in the corporation, the payments he and other officers and directors were receiving from the company, the fact that he intended to use the funds derived from the O'Connors to make payments to himself, or the fact that the corporations were his alter ego.

## DISCUSSION

Plaintiff contends that the debt represented by the two notes is nondischargeable under § 523(a)(2)(A) of the Bankruptcy Code ("the Code"). Section 523(a)(2)(A) provides:

(a) A discharge under §§ 727, [or] 1141 ... of this Title does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

In contrast, § 523(a)(2)(B) provides that a discharge will not be granted for money obtained by—

use of a statement in writing—

(i) that is false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money ... reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive.

While the Court recognizes that 523(a)(2)(A) and (B) have generally been held to be mutually exclusive, *See eg. In re Kirsh*, 973 F.2d 1454, 1457 (9th Cir.1992) ("As a plain reading of the statute shows, parts (A) and (B) are mutually exclusive, the former referring to representations other than those respecting the debtor's financial condition and the latter referring specifically to written statements of financial condition."); and *In re Olinger*, 160 B.R. 1004, 1007 (Bankr. S.D.Ind.1993) (" 'Subparagraph (A) is mutually exclusive from subparagraph (B).' "), this case is somewhat unique in that both sections could be applicable since Defendant committed various forms of fraud during an ongoing relationship.[5] In particular, Mr. Booker not only misrepresented his purpose for acquiring the funds, but also used fraudulent financial statements.

Due to the fact that the sections have been held to be mutually exclusive, any analysis under § 523(a)(2) usually "must first determine which of the two statutes is applicable." *Olinger*, 160 B.R. at 1007.[6] This Court believes that an action would have been maintainable under § 523(a)(2)(B) because the debtor arguably committed material fraud by written financial statements. However, the debts clearly are nondischargeable under § 523(a)(2)(A), and it is, therefore, unnecessary for this court to reach § 523(a)(2)(B).

## Section 523(a)(2)(A)

Generally, the elements a creditor must prove to support a claim under § 523(a)(2)(A) are:

(1) the debtor made a representation;

(2) the debtor knew the representation to be false at the time it was made;

(3) the debtor intended to deceive the creditor at the time the debtor received the money;

(4) the creditor relied on the representation; and

(5) the creditor sustained a loss as a result of that reliance.

*In re Showalter*, 86 B.R. 877 (Bankr.W.D.Va. 1988). *See also* The Honorable Nancy Dreher, and Matthew Roy, *Bankruptcy Fraud and Nondischargeability Under Section 523 of the Bankruptcy Code*, 69 N.D.L.Rev. 57 (1993).

The burden is on the creditor to establish each element by a preponderance of the evidence. *See Grogan v. Garner*, 498 U.S. 279, 285–87, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991); and *Combs v. Richardson*, 838 F.2d 112, 116 (4th Cir.1988). After hearing all the testimony, viewing the evidence, and considering the surrounding circumstances, this Court finds that the O'Connors established each of these elements.

---

**5.** Under § 523(a)(2)(A), statements "respecting the debtor's or an insider's financial condition" cannot serve as the basis for nondischargeability. There is a split among the Circuits as to what constitutes a "statement respecting the debtor's or an insider's financial condition." The Ninth Circuit has held that this phrase refers specifically to written statements about the overall financial condition of the debtor, the so-called "false financial statement," and not to statements about one asset. *In re Kirsh*, 973 F.2d 1454, 1457 (1992) ("the statement we are considering did not purport to set forth the debtor's net worth or overall financial condition, so our analysis must resolve around § 523(a)(2)(A)"). Many other courts agree with the Ninth Circuit's view. *See Kloven v. Ramsey*, 1993 WL 181309 (D.Minn. 1993); *In re Olinger*, 160 B.R. 1004, 1007–1008 (Bankr.S.D.Ind.1993); *In re Oliver*, 145 B.R. 303, 305 (Bankr.E.D.Mo.1992); and *In re Mercado*, 144 B.R. 879 (Bankr.C.D.Cal.1992).

The Fourth Circuit, however, gives a much broader interpretation to the phrase. *See In re Blackwell*, 702 F.2d 490, 492 (1983) (statements to the effect that "the business is growing" and "is very successful" are statements respecting the debtor's financial condition); and *In re Van Steinburg*, 744 F.2d 1060, 1061 (1984) (Congress "referred to a much broader class of statements—those" "respecting the debtor's ... financial condition," and whether certain pieces of debtor's property were encumbered was such a statement).

Although the more recent cases have agreed with the Ninth Circuit, this Court does not have to reach this issue because, while Mr. Booker did make statements respecting companies' financial conditions, he also misrepresented how the money was to be spent and how the companies were run. These misrepresentations are not statements "respecting the debtor's or an insider's financial condition" under either interpretation of the Code.

**6.** Defendant maintains that the action should have been brought under § 523(a)(2)(B). Defendant moved at trial to dismiss for failure to plead the correct section of the Code. The Court denied the motion.

The first element requires false representation or pretense by the debtor. Mr. Booker made overt misrepresentations and misrepresentations by omission. When he first solicited the O'Connors' investment, he overtly represented that Lambie Investments was formed to fund the operation of the Lambie Group, and that any money raised would be put to that use. When Mr. Booker received the funds, he did not take any steps to correct that misrepresentation, and then immediately converted the funds to his personal use.

■ This Court believes that omissions can constitute representations for purposes of nondischargeability, especially where the circumstances of the case create a false impression which is known by the debtor. *See* Dreher and Roy, *supra*, at n. 58. Mr. Booker knew that the O'Connors expected the money they invested in Lambie Investments to go to the business purposes of the Lambie Group, and this expectation was at the core of the O'Connors' interest in the investment. If they had known the true intentions of Mr. Booker, or were aware of the control he exercised over the corporation, their interest would have waned considerably. Furthermore, when Mr. Booker received the money, he understood that the O'Connors considered the loans to be investments. This understanding, and his close relationship with the O'Connors' finances, created a duty to disclose his intentions with regard to the funds received. It is this misrepresentation that serves as the basis for nondischargeability under § 523(a)(2)(A).

There is little doubt that Mr. Booker knew the representation was false when he made it. Immediately prior to receiving the funds from the O'Connors, Mr. Booker had attempted to cash the check he had written to himself, but the company had insufficient funds. Within three days after receiving the money, he resubmitted the check and it cleared. That check established Mr. Booker as a debtor to the corporation.

All the circumstances show that Mr. Booker intended to deceive the O'Connors when he received the money. From assessing the veracity of the witnesses and studying the exhibits, it is clear to the Court that Mr. Booker intended to put the funds to his personal use. The fact that he was holding the bad check when he received the funds, and resubmitted the check within three days clearly implies that he had the intention of misappropriating the funds when he received them. Further, this Court is certain that Mr. Booker not only intended to use the funds for his own purposes, but also intended to mislead the O'Connors into believing the investment would be used for business purposes.

This Court finds further that the O'Connors relied on Mr. Booker's advice regarding this investment, and that they specifically relied on the representation that their money would be invested in the corporation, and not used by Mr. Booker personally. Undoubtedly, the O'Connors would have chosen not to make the investment if Mr. Booker had informed them of the true purpose for his obtaining the funds.

■ Defendant maintains that the O'Connors must not only show that they relied on Mr. Booker's representations, but also that the reliance was reasonable. Whether the Code imposes a reasonableness standard in the creditor's reliance on the misrepresentations is another issue upon which the Circuits are divided. The Eighth and Fifth Circuits have held that there is no requirement of reasonableness. *See In re Ophaug*, 827 F.2d 340, 342 (8th Cir.1987) ("section 523(a)(2)(A) does not require a creditor to prove that his reliance ... was reasonable"); and *In re Allison*, 960 F.2d 481, 485 (5th Cir.1992) (the court need not make inquiry into whether the reliance was reasonable, only whether creditor in fact relied). The Sixth, Seventh, and Tenth Circuits, however, have required that the creditor show his reliance was reasonable. *See In re Ledford*, 970 F.2d 1556, 1559–60 (6th Cir.1992) (citing *In re Phillips*, 804 F.2d 930, 933 (6th Cir.1986), and finding reasonableness requirement implied in the statute); *In re Kimzey*, 761 F.2d 421, 423 (7th Cir.1985) (creditor must show that he actually relied, and that his reliance was reasonable); and *In re Mullet*, 817 F.2d 677, 679 (10th Cir.1987) (the standard of reasonableness required under § 17(a)(2) of the

Bankruptcy Act should continue to be imposed under the Code).

Although the courts which have found that § 523(a)(2)(A) lacks a reasonableness requirement have strong support in the legislative history,[7] this Court declines to rule on whether there is such a reasonableness requirement because the O'Connors overcome any hurdle of reasonableness which may be imposed by the Code. In *In re Ledford,* 970 F.2d 1556, 1560 (6th Cir.1992), the court held that "[w]hether a creditor's reliance was reasonable is a factual determination to be made in light of the totality of the circumstances." The factors to consider in deciding whether a creditor was reasonable in his reliance are: "(1) whether the creditor had a close personal relationship or friendship with the debtor; (2) whether there had been previous business dealings with the debtor that gave rise to a relationship of trust; (3) whether the debt was incurred for personal or commercial reasons; (4) whether there were any 'red flags' that would have alerted an ordinarily prudent lender to the possibility that the representations relied upon were not accurate; and (5) whether even minimal investigation would have revealed the inaccuracy of the debtor's representations." *Id.* Furthermore, the reasonableness requirement imposed by the Sixth Circuit "was not particularly rigorous; [the Sixth Circuit] viewed the requirement as a filter intended to isolate creditors who had acted in bad faith." *Id.*

This Court finds that the O'Connors were reasonable in their reliance. The O'Connors had an eight-year relationship of trust with Mr. Booker. He did all their books and taxes, and Mrs. O'Connor convincingly testified that she and Mr. O'Connor completely trusted his judgment in financial matters, and considered him a personal friend. There was no testimony offered by either side that would show the O'Connors were put on notice by any "red flags," nor was there any

evidence to suggest the possibility of discovery of the fraud by investigation.

The final requirement of § 523(a)(2)(A) is that the creditor suffer loss as a result of the reliance. This element is clearly met since the O'Connors have lost almost their entire investment,[8] and there is no prospect of them recovering the money elsewhere. Furthermore, without the fraudulent acts committed by Mr. Booker, the O'Connors would not have made the investment.

### Section 523(a)(4)

Notwithstanding the nondischargeability of this debt under § 523(a)(2)(A), the debtor is also denied discharge under § 523(a)(4). That section excepts from discharge any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4).

■ Plaintiff asserts that the debt is nondischargeable because Mr. Booker committed fraud or defalcation while in a fiduciary capacity. In order to succeed based upon this argument, Plaintiff must show that a fiduciary relationship arose from an express trust, or by operation of state or federal law. *See Matter of Bennett,* 989 F.2d 779, 784 (5th Cir.1993) ("the concept of fiduciary under 11 U.S.C. § 523(a)(4) is narrowly defined, applying only to technical or express trusts, and not those which the law implies from contract"). The creditor must further show that such a relationship arose prior to the transfer of money in question. *Id.* ("The debtor must have been a trustee before the wrong and without any reference to it.").

■ This Court finds it unnecessary to consider whether a fiduciary relationship existed between these parties because sufficient grounds exist to render the debt nondischargeable for embezzlement under § 523(a)(4). "Clearly, a debt can be nondischargeable for embezzlement under § 523(a)(4) without the existence of a fiducia-

---

**7.** *See* Dreher and Roy, *supra* at n. 75. This court also is aware that the only court in the Fourth Circuit to address the issue found that there was no requirement that the creditor's reliance be reasonable. *See In re Showalter,* 86 B.R. 877, 881 (Bankr.W.D.Va.1988).

**8.** The O'Connors complaint asks for damages of $140,000 plus interest less the recovery made in settlement of a claim with another principal in the Lambie Group. Therefore, while the entire investment was not lost, the fraud committed by Mr. Booker still resulted in the loss of the majority of the funds.

ry relationship." *In re Littleton,* 942 F.2d 551, 555 (9th Cir.1991).

Under § 523(a)(4), "[f]ederal law is controlling as to the definition of embezzlement." *Matter of Jenkins,* 110 B.R. 74, 76 (Bankr.M.D.Fla.1990). Under federal law, embezzlement requires three elements: " '(1) property rightfully in the possession of a nonowner; (2) nonowner's appropriation of the property to a use other than which [it] was entrusted; and (3) circumstances indicating fraud.' " *Littleton,* 942 F.2d at 555 (quoting *In re Hoffman,* 70 B.R. 155, 162 (Bankr.W.D.Ark.1986)).

As the discussion regarding § 523(a)(2)(A) above indicates, it is clear that Mr. Booker took the funds entrusted to him by the O'Connors and put them to his personal use, rather than the use intended by the O'Connors. Whether Mr. Booker intended to defraud the O'Connors is a question of fact. *Id.* The circumstances surrounding the misappropriation clearly indicate fraud, and this Court, considering all the evidence and testimony, finds that Mr. Booker intended to defraud the O'Connors when he received the funds. Therefore, each element of embezzlement is met, and the debt is nondischargeable under § 523(a)(4).

For the reasons stated herein, the debtor is denied discharge for both debts pursuant to §§ 523(a)(2)(A) and (a)(4).