**In re Charles T. LOIGNON and Margaret E. Loignon. Debtors.**

**Rebecca S. Boyd, Plaintiff,**

v.

**Charles T. Loignon and Margaret E. Loignon, Defendants.**

Bankruptcy No. 02–52484C–7.
Adversary No. 02–6072.

United States Bankruptcy Court, M.D. North Carolina, Winston–Salem Division.

Jan. 30, 2004.

Daniel C. Bruton, Winston–Salem, NC, for Plaintiff.

Gail C. Arneke, Winston–Salem, NC, for Defendants.

## Memorandum Opinion

CATHERINE R. CARRUTHERS, Bankruptcy Judge.

This adversary proceeding came on for trial before the undersigned Bankruptcy Judge upon the Complaint filed by Rebecca S. Boyd ("Plaintiff"). The Plaintiff seeks to have the debt owed to her by Charles T. Loignon and wife, Margaret E. Loignon ("Defendants") excepted from Defendants' discharge pursuant to 11 U.S.C. § 523(a)(2)(A). Appearing before the court was William A. Scott and Daniel C. Bruton, counsel for the Plaintiff, and Gail C. Arneke, counsel for the Defendants. The Court after reviewing the evidence presented, makes the following findings of fact pursuant to Bankruptcy Rule 7052.

The Court has jurisdiction to hear this adversary proceeding pursuant to 28 U.S.C. §§ 1334 and 157 and this adversary proceeding is a core proceeding pursuant to 18 U.S.C. § 157(b)(2)(1). This adversary proceeding arises in the bankruptcy case of the Defendants, which was filed on September 18, 2002 and is known as Case No. 52484C–7, Charles T. Loignon and Margaret E. Loignon.

## BACKGROUND

In December 1992, the Defendants purchased a fifty-two foot, 1958 Chris Craft Roamer steel hulled motor yacht (the "boat") for approximately $38,000.00. They financed a portion of the purchase price with the seller of the boat. The boat was in poor condition at the time, but the Defendants did not have the boat surveyed prior to the closing on the boat. Over the course of the next few years, Mr. Loignon worked to restore the boat. He was unemployed at the time and was drawing disability and social security. Mr. Loignon spent a great deal of time restoring the boat. It was his intent to live on the boat with his wife. In 1995 he was interviewed by the *Mariner* magazine, which summarized his work as follows:

> For the next two summers [following the purchase] Loignon worked thirty hours per week in his spare time replacing nearly half of the bottom of the boat. Prior to his retirement, Loignon had worked as a welder for 35 years so he had the skills needed to repair and restore the vessel.

In 1997, the Defendants were living in New Jersey and obtained custody of an infant and Mrs. Loignon no longer wanted to pursue the idea of living on the boat. In the fall of 1997, Mr. Loignon decided to sail the boat from New Jersey to Florida; however, the boat broke down in Charleston, South Carolina. In December 1997, Mr. Loignon retained the services of Ross Marine, Division of SSI, John's Island, S.C. to make repairs on the boat. These repairs were completed in March, 1998. Mr. Loignon testified that insurance paid the majority of the $16,000 plus repair bill. The work included sandblasting the hull of the boat and repainting. The invoice from Ross notes that "due to the age of machinery and corrosion, labor hours are higher than normal."

Once the repairs were completed, Mr. Loignon decided to keep the boat in Charleston and listed the boat for sale. The boat did not sell during that year, so in late March of 1999, Mr. Loignon retained a new listing agent for the sale of the boat, Harkey and O'Neal. The listing price was $119,000 and the listing agreement stated that the "current owner has owned this yacht for 7 years and extensively rebuilt her in that time. He began by removing a large part of the steel hull, replacing the fuel tanks, and replacing the

hull with new steel. The port engine and the starboard transmission have been recently rebuilt. The entire electrical system has been rewired with marine grade wiring." The listing agreement went on to contain the following buyer beware language:

No warranties: The buyer expressly agrees that no warranties or representations, expressed or implied, have been or will be made directly or indirectly by the seller or brokers concerning the condition or use of the yacht. The buyer further expressly agrees that he has not relied upon any oral representation by the seller or the brokers as to the condition or the capability of the yacht or its inventory. The buyer also recognizes and acknowledges that yachts and their inventory may have both apparent and/or hidden defects and the buyer accepts responsibility for determining the condition for the yacht, its inventory, and the existence of any defects.

The Plaintiff is a 52 year old widow who presently lives with her father and her 18 year old son in Asheville, North Carolina. She is a graduate of Wake Forest University and worked as editor of the Winston Salem paper and the Asheville paper for over 17 years. In 1996, her husband became ill, and passed away on July 1, 1996. The Plaintiff and her husband owned a home in Asheville and she continued to live there with their son after her husband's death, Eventually, the Plaintiff decided it would be best if she left Asheville and pursue her dream of living on a houseboat in Charleston, South Carolina. She had never owned a boat before. In early 1999, the Plaintiff began her search for a houseboat on the internet. She estimated that she could net about $40,000 from the sale of her home and was looking for boats in that price range, but could not find anything. In March of 1999, the Plaintiff went to look at two boats in Charleston with an agent from Harkey and O'Neal. She did not like either of those boats and the agent told her that the company had a new listing, but that the boat was much more expensive than the price range in which she had been looking. The Plaintiff wanted to see the boat, however the listing was so new that the agent did not have the key to view the inside of the boat. They were only able to look at the outside of the boat, but the Plaintiff fell in love with the boat and made arrangements to return to Charleston in the next week or two to view the interior of the boat.

On her next trip to Charleston, the Plaintiff met Mr. Loignon and was given a tour of the boat. Mr. Loignon advised her that he had restored the boat and that it had new wiring, new woodwork and that he had replaced the entire hull except for a small area of the boat. In the living area of the boat were several copies of the *Mariner* article detailing work Mr. Loignon had done on the boat. Mr. Loignon gave a copy of the newspaper to the Plaintiff for her to read and keep. He told the Plaintiff that the article was written before he had finished all of the work. The Plaintiff was impressed with the appearance of the boat and with Mr. Loignon.

Over the next few weeks the Plaintiff made several trips to Charleston, and she and Mr. Loignon developed a relationship. Although the parties differ as to the extent of their relationship, both agree that Mr. Loignon wanted to gain the Plaintiffs trust and was successful in doing so. On May 15, 1999, the Plaintiff signed a contract to purchase the boat for the sum of $105,000 and made a deposit of $5,250. The sale of the boat was contingent upon the following:

1. Satisfactory survey

2. Satisfactory sea trial

3. Obtaining financing

4. Buyer can extend date of closing to 30 days if necessary from sale of her home

5. Renoir print in master stateroom conveys with vessel

The Plaintiff hired a company to survey the boat. The survey was conducted in the water, with a diver going in the water to check the hull of the boat. It is possible to do a survey out of the water to view the hull, but not a great deal can be seen if the boat has new paint. This boat did have new paint from the repairs done the prior year. The Plaintiff could have asked that the paint on the hull be sandblasted but she elected not to do so, in part because Mr. Loignon had told her that he had done it the year before and the hull of the boat had been rebuilt by him. The Plaintiff was unable to obtain financing with a bank and she advised the broker that she could not go forward with the purchase. At that time, Mr. Loignon told the Plaintiff that he would finance the purchase price with a six month balloon note. The Plaintiff elected to go forward with short-term financing and the closing was scheduled for June 19, 1999. On the day of closing, the Plaintiff was presented with a written copy of the boat survey. The survey noted several problems with the boat and concluded that it had a fair market value much lower than the purchase price (only $78,300). Mr. Loignon advised the Plaintiff that the survey was not accurate and contained numerous errors; however, he admitted that not all of the wiring in the kitchen had been replaced. As a result, Mr. Loignon agreed to escrow $2,000 to pay for wiring in the kitchen. At this time, the Plaintiff contends she had a physical and emotional relationship with Mr. Loignon and believed that he had her best interest at stake. The closing took place and the Defendants were paid the sum of $35,000 and took a note for the balance of the purchase price. Two weeks after the closing, Mr. Loignon

spent the night on the boat, which was the last time the Plaintiff saw him prior to litigation.

After the purchase, the Plaintiff made monthly payments, but was unable to obtain bank financing over the next six months. At the end of the six months the Defendants agreed to extend the loan for another six months. Plaintiff continued to make payments during this period, but was still was unable to obtain a bank loan and did not make the July 2000 payment. In August of 2000, Mr. Loignon proposed that the Plaintiff pay the sum of $50,000 in full settlement of the Debt (the owner financing had been in the amount of $65,000). The Plaintiff borrowed the sum of $50,000 from her father and paid the Defendants.

A few weeks later, the Plaintiff made arrangements to have the boat taken out of the water so that it could be inspected for insurance purposes. The boat was taken out of the water in December 2000 and was sandblasted so the hull could be examined. At that time, it was discovered that the boat had five or six holes in the hull that varied in size from two to eight inches. An inspection of the hull disclosed that only about twenty five percent of the hull had been repaired with new steel. The majority of the holes were near the bow, an area that Mr. Loignon had advised the Plaintiff he had restored with new steel.

The contract for the sale of the vessel provided that any dispute would be arbitrated in accordance with the American Arbitration Rules. The dispute was arbitrated accordingly, and on July 22, 2002 the arbitrator entered an award providing as follows:

Charles T. Loignon and Margaret E. Loignon shall pay to Rebecca S. Boyd the sum of One Hundred Eight Thou-

sand Dollars and no Cents($108,000) within thirty (30) days of the date of this signed Award.

Rebecca S. Boyd shall give Charles T. Loignon and Margaret E. Loignon possession of the boat within thirty (30) days of this signed award.

The administrative fees and expenses of the American Arbitration Association and the compensation and expenses of the arbitrator totaling Three Thousand Nine Hundred Dollars and No Cents ($3,900.00) shall be borne by Charles T. Loignon and Margaret E. Loignon. Therefore, Charles T. Loignon and Margaret E. Loignon shall jointly and severally pay to Rebecca S. Boyd the sum of Two Thousand Four Hundred Seventy–Five Dollars and No Cents ($2,475.00) for administrative fees and expenses and/or arbitrator compensation and expenses previously advanced by Rebecca S. Boyd to the Association.

On August 9, 2002, the Plaintiff executed a Bill of Sale for the vessel to the Defendants. The Defendants knew the Arbitration Judgment was going to be docketed against them on September 18, 2002. Prior to the entry of the Judgment on September 18, 2002, the Defendants filed a Chapter 7 petition.

The Defendants listed their ownership interest in the boat on the bankruptcy schedules and valued the boat at $20,000. The Defendants did not include it in their list of exempt property. The Chapter 7 Trustee contacted parties that might be interested in purchasing the boat. As of December 2, 2002, the boat was subject to storage fees in favor of Rockville Marine of approximately $10,63 1.41. The Trustee could find no one interested in purchasing the boat as the bottom had been rusted and "looks like Swiss cheese." The Trustee filed a motion to abandon the boat which was granted by Order of this Court.

Mr. Loignon admits that the article from the *Mariner* that he gave to the Plaintiff overstated the amount of repair work on the vessel. He admits that he had not replaced all of the wiring nor had he replaced "nearly half of the hull." He also admits that there were errors in the description of the vessel in the listing agreement. Mr. Loignon felt no obligation to correct these misstatements because he wanted to sell the vessel. As Mr. Loignon put it himself, "Does an advertiser advertise something might be wrong with a pack of cigarettes?"

The Plaintiff admits that she had no contact with Mrs. Loignon prior to the purchase of the vessel.

## DISCUSSION

Plaintiff seeks to have the debt of $110,475.00 declared nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A), the damages trebled pursuant to the South Carolina Unfair Trade Practices Act, and pursuant to that Act, the costs of this action, including reasonable attorney fees, assessed against the Defendants.

Section 523(a)(2)(A) provides that a debtor is not entitled to a discharge of debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by...false pretenses, a false representation, or actual fraud." To except a debt from discharge under this provision, the Plaintiff must prove (1) that the Defendants made a false representation; (2) that at the time of making the representations, the Defendants knew they were false; (3) that the Defendants made the representations with the purpose and intent to deceive Plaintiff; (4) that the Plaintiff justifiably relied upon the representations; and (5) that the Plaintiff sustained a loss as a result of the representation. *Field v. Mans*, 516 U.S.

59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995); *In re Booker,* 165 B.R. 164 (Bankr. M.D.N.C.1994.); *In re Vickers,* 247 B.R. 530, (Bankr.M.D.Fla.2000).

■ The Plaintiff must prove that the debt is nondischargeable by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991) and exceptions to discharge should be strictly construed in favor of dischargeability in order to give Debtors the benefit of a fresh start. *In re Miller,* 39 F.3d 301, 304 (11th Cir.1994); *In re Hudson,* 107 F.3d 355, 356 (5th Cir.1997).

The Court finds that the statements made by Mr. Loignon and the information contained in the magazine article were false, and that Mr. Loignon knew they were false at the time that he made them. The Plaintiff prevails on the first two elements.

The third element is intent to deceive. Mr. Loignon consciously chose not to inform the Plaintiff that the listing agreement had errors or that the magazine article contained errors. He made repeated statements about the condition of the vessel that were false and he made them with the intent to deceive the Plaintiff, The boat had been on the market for a year and this was his first and only prospect of a buyer. He testified that he developed a relationship with the Plaintiff so she would trust what he said. He intended to deceive her about the condition of the vessel. The Plaintiff has carried her burden of proof as to intent to deceive.

■ The key issue is whether the Plaintiff was justified in relying on the magazine article and the statements made by Mr. Loignon. He was the seller and his goal was to sell the vessel. In *Field v. Mans,* the Supreme Court found that justifiable reliance differs from reasonable reliance in that justifiable reliance is subjec-tive standard while reasonable reliance is an objective standard. *Field v. Mans,* 516 U.S. at 70, 116 S.Ct. 437. The Court stated:

> Although the plaintiffs reliance on the misrepresentation must be justifiable. . . .this does not mean that his conduct must conform to the standard of the reasonable man. Justification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases.

*Id.* at 70–71, 116 S.Ct. 437.

■ To prove justifiable reliance, a creditor must show some degree of diligence in determining creditworthiness, but not that degree of diligence that a reasonable person would use. *First Deposit Nat'l Bank v. Mack,* 216 B.R. 981 (Bankr. N.D.Fla.1997). In this case, the Plaintiff exercised a degree of diligence when she had the boat inspected including an underwater inspection. She was ready to walk away from the purchase when she could not obtain financing, so this was not property she had to have. After Mr. Loignon offered her short term financing, she decided to close on the vessel. The Plaintiff questioned the wisdom of that decision when she was given a copy of the inspection the morning of the closing. It clearly stated that there were problems with the boat and that the purchase price exceeded the value of the vessel. However, by the date of the closing, the Plaintiff had sold her home in Asheville, moved all her belongings to Charleston, and was involved in what she hoped would be a long term relationship with Mr. Loignon. It was her hope to live with him and her son on the yacht. Plaintiff genuinely believed Mr. Loignon when he told her that the problems with the boat had been overstated in the inspection. Plaintiff thought that Mr.

Loignon cared about her and that he was interested in more than just being paid his money. The court finds that based upon these circumstances, the Plaintiff has met her burden of showing justifiable reliance.

The Plaintiff has been injured as a result of the actions of Mr. Loignon. She gave the Defendants a bill of sale to the boat in exchange for an award of $108,000. The Defendants have sought to discharge the debt and turned the vessel over to the bankruptcy trustee to liquidate for the benefit of all creditors. The Plaintiff has been damaged in the amount of $110,465.00 representing the amounts paid for the vessel and the money expended on the arbitrator.

■ The Plaintiff argues that both Mr. and Mrs. Loignon should be found to owe the Plaintiff a nondischargeable debt under 11 U.S.C. § 523(a)(2)(A). Plaintiff argues (1) that Mrs. Loignon received the benefit of the monies paid by the plaintiff, (2) that the arbitration award was against both parties and (3) that Mr. Loignon acted as an authorized agent for his wife.

■ Even if the Court finds that the debt is nondischargeable as to Mr. Loignon, such a finding is not possible as to Mrs. Loignon, despite Mrs. Loignon receiving the benefit of the monies paid. Mrs. Loignon never met with or spoke to the Plaintiff. Mrs. Loignon committed no "moral turpitude or intentional wrong." *See In re Tsurukawa,* 258 B.R. 192, 197 (9th Cir. BAP 2001). There is no basis to find the debt of the Plaintiff nondischargeable as to Mrs. Loignon. *See In re Allison,* 960 F.2d 481 (5th Cir.1992) (spouse not liable for fraud committed by her husband.); *In re Tsurukawa,* 258 B.R. 192. There are cases, typically dealing with partners where debts have been held to be nondischargeable as to both partners, when one partner acted on behalf of his other business partner. *See In re Led-*

*ford,* 970 F.2d 1556 (6′″ Cir.1992). In the matter before the Court, there is no evidence of a business relationship between the Defendants and "marital status alone does not create an agency relationship." *In re Tsurukawa,* 258 B.R. at 198; *See also In re Tara of N. Hills,* 116 B.R. 455, 462 (Bankr.E.D.N.C.1989) aff'd 904 F.2d 701 (4th Cir.1990) (holding that a wife is not the agent of her husband strictly by force of the marital relationship). Section 523(a)(2)(A) requires intent to deceive and this intent cannot be imputed from Mr. Loignon to Mrs. Loignon. There is no evidence before the Court that Mrs. Loignon was aware of statements Mr. Loignon was making, therefore, the court will enter judgment in favor of Mrs. Loignon.

*Treble damages and attorney fees*

■ The Plaintiff has requested that the damages awarded to Plaintiff and against the Defendants be trebled pursuant to the South Carolina Unfair Trade Practices Act, and that pursuant to the South Carolina Unfair Trade Practices Act, the costs of this action, including reasonable attorney fees, be assessed against the Defendants.

The South Carolina Unfair Trade Practices Act is codified in the South Carolina Code of Laws in Section 39–5–10 *et seq.* and provides "unfair or deceptive acts or practices in the conduct of any trade or commerce , are....declared unlawful." S.C.Code Ann. § 39–5–20. The terms "trade" and "commerce" are defined in Section 39–5–10(b) to "include the advertising, offering for sale, sale or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity or thing of value wherever situated, and [to] include any trade or commerce directly or indirectly affecting the people of this State." S.C.Code Ann. § 39–5–10. The Statute

provides for a private right of action for any person that is damaged by an unfair and deceptive act and treble damages are recoverable under Section 39–5–140 if the "use or employment of the unfair or deceptive...act or practice was a willful or knowing violation of Section 39–5–20." S.C.Code Ann. § 39–5–140.

■ Case law in South Carolina provides that to prevail on an action under the Unfair Trade Practices Act, the unfair or deceptive act or practice must impact upon the public interest and have the potential for repetition. *Noack Enterprises, Inc. v. Country Corner Interiors*, 290 S.C. 475, 351 S.E.2d 347 (1986) (the act is not available to redress a private wrong where the public interest is unaffected); *see also Daisy Outdoor Advertising v. Abbott*, 322 S.C. 489, 473 S.E.2d 47 (1996) (Plaintiff bringing a private cause of action under UTPA must allege and prove that the defendant's actions adversely affected the public interest).

Plaintiff has not alleged, nor has there been any evidence that the actions of Mr. Loignon adversely affected the public interest. Mr. Loignon only owned one vessel so there is no potential for repetition of his conduct. Accordingly, the Plaintiff has failed to state a cause of action under the South Carolina Unfair Trade Practices Act and relief under the Act is denied.

## CONCLUSION

Based on the foregoing, the Court concludes that the Plaintiff has a § 523(a)(2)(A) non-dischargeable debt against the Defendant Mr. Loignon in the amount of $110,475.00. The indebtedness of Mrs. Loignon is discharged. The Plaintiffs request for treble damages and attorney fees is hereby denied.

A separate judgment in accordance with this memorandum opinion will be filed contemporaneously herewith.